[Crim. No. 5797. Fifth Dist. June 15, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
NANCY ADAMS, Defendant and Appellant.

974

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Cynthia A. Thomas, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian and Daniel J. Kremer, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and Margaret Elaine Garnand, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANSON (P. D.), J.**—Appellant, convicted by a jury of the first degree murder of her friend and lover, contends that crucial admissions were obtained from her through impermissibly coercive police tactics and that the use of these statements and their fruits was prejudicial. We agree that critical statements of appellant were the product of psychological coercion and other improper influences during questioning. Our reasons for reversing the

judgment on this ground are discussed in detail. (*People* v. *McClary* (1977) 20 Cal.3d 218, 227 [142 Cal.Rptr. 163, 571 P.2d 620].)

Appellant was charged by information filed in Kings County with the murder of Jerry Lee Pollock in violation of Penal Code section 187, subdivision (a), and with the use of a gun in the commission of the offense. (Pen. Code, § 12022.5.)

Appellant's pretrial common law motion to suppress statements on the ground of coercion by police interrogators and to dismiss (Pen. Code, § 995) was denied in Kings County Superior Court. Thereafter, appellant's petition for a writ to overturn the ruling was denied by this court. Appellant's pretrial motion for change of venue was denied. After jury selection began, a renewed motion for change of venue was granted and the case was transferred from Kings County to Kern County.

The case was tried twice in Kern County. The jury in the first trial was unable to reach a verdict and the court declared a mistrial. Before the second jury trial appellant renewed her motion to suppress statements made during questioning by the Kings County Sheriff and all statements which followed this interrogation; the motion was denied. On the 13th day of trial, appellant was convicted of first degree murder with the use of a gun. She was sentenced to state prison for 25 years to life plus a consecutive term of 2 years for the gun use allegation.

*Facts*

Jerry Lee Pollock was killed shortly after 8:10 p.m.[1] on the rainy evening of February 19, 1980, in a rural area two miles south of Lemoore in Kings County. Soon after Pollock was shot, Dave Oliveira and his wife Kathy approached the intersection of 19th Avenue and Idaho and saw a van with flashing lights in the middle of the road. Oliveira also noticed a body in the road; the van moved forward and back as the headlights went on and off once and the flashing lights came on.

The Oliveiras stopped their car and ran up to the body. Appellant got out of the driver's side of the van and approached them, saying " 'Please help me. Oh, God, please help me.' " Oliveira testified the victim "was not breathing" and appeared to have been hit by a car. He sent his wife to the nearest house, the Leal home, for assistance. No one was in the area other than appellant, Oliveira and the victim.

---

[1] The time of the shooting was established through the testimony of Ray Magana, a PG&E lineman whose duties took him repeatedly by the intersection where the incident occurred. At 8:10 p.m., the intersection was clear. As Magana returned from the PG&E yard about 8:25 p.m., there was a van blocking one lane and a body in the street; appellant had left the scene.

Oliveira asked appellant what happened and appellant replied, " 'They shot my Jerry.' " Appellant said while she and Pollock were parked at the intersection a car stopped and one of the occupants asked Pollock for help. The unidentified man shot Pollock and, when Pollock attempted to run, more shots were fired. Appellant said she saw the attackers beat and kick Pollock and as she knelt beside the victim, one of the men aimed a gun at her head and squeezed the trigger; the gun misfired and appellant blacked out. After Oliveira arrived, appellant sat in the van holding a wallet and said " 'They didn't even take his money.' " When Tony Leal and two others arrived, Oliveira drove appellant in the van to the Leal home where he called appellant's father at her request. Appellant was crying as she talked.

Kathy Oliveira called the sheriff's department from the Leal home and was present when her husband brought appellant to the house. Appellant lay on top of her purse on a couch in the living room; she looked uncomfortable. When Mrs. Oliveira offered to take the purse to make her more comfortable, appellant "grabbed it and said 'I'm okay,' " putting the purse farther behind her. Appellant repeated her account of the attack upon "Jerry" by two or three men. One of the men who had Pollock's wallet threw the wallet down. Appellant explained she and Pollock had been waiting to meet a woman who was going to show them a house. Appellant said they had planned to get married the next day. When Mrs. Oliveira offered to put the victim's wallet, which had bills protruding from it, into appellant's purse, appellant said " 'No, I'll hold onto the wallet.' "

Sheriff's officers arrived and appellant again described an assault by strangers. When appellant's father arrived appellant said, " 'Oh, Daddy, they shot my Jerry. . . . Oh, and Daddy, we had a surprise for you, because we were going to get married tomorrow.' "

Eventually the Kings County Sheriff, who had been sheriff for two and one-half years and who was acquainted with appellant, arrived. He greeted her by her first name and talked with her alone. Appellant told the sheriff substantially the same story and agreed to accompany officers to the scene to answer further questions. She described a shooting by strangers, but could not provide a useful description of the suspects or the vehicle. Appellant returned to the scene in the front seat of the sheriff's car.

Appellant spent 10 to 15 minutes with officers at the scene and agreed to repeat her statement with a court reporter present, but requested that she first use a respirator at home to stem a slight asthma attack. The sheriff drove appellant and her father to her residence in Hanford and waited 10 minutes while appellant went into her bedroom alone, taking her purse. The sheriff then drove appellant directly to the sheriff's department where a detective sergeant in the Kings County Sheriff's office took a court-reported statement commencing at 12:55 a.m. and concluding at 3 a.m., February

20, 1980.[2] This entire statement was read into the record. It relates in detail appellant's activities during the day and the previous day and an account of the shooting similar to appellant's earlier statements. In the reported statement, appellant said she thought she hit Pollock with the van while trying to back the vehicle close enough to lift him inside. She claimed she was unaware whether Pollock had owned a gun, and explained that she spent the day moving the victim's possessions into her apartment but saw no gun.

The testimony of a pathologist and a criminalist established that Pollock was shot in the chest with a .22 caliber semiautomatic pistol. Dr. Dollinger, the pathologist, testified that Pollock bled to death internally within minutes of receiving a "perforated" gunshot wound. The victim sustained multiple severe abrasions consistent with being run over by the van.

At the scene of the homicide, the detective sergeant found a .22 caliber live round, a .22 caliber spent cartridge and two pools of blood, one 'across the road' from the body. After appellant gave her court-reported statement on February 20, 1980, the detective sergeant found a live .22 caliber bullet on the floorboard of the van and a spent .22 caliber cartridge on the passenger's seat. The two spent rounds came from a .22 caliber semiautomatic pistol. The live bullet in the van had "extractor marks" indicating it was manually removed from the pistol; the other live round "probably . . . was never in the . . . pistol." Another spent cartridge was later found in the defroster vent on the driver's side of the van; it was fired from the same pistol.

Between the 20th and 28th of February, the detective sergeant discovered from other sources that the victim had owned a .22 caliber Ruger semiautomatic weapon which normally was kept in Pollock's apartment, but had not been found by police officers. The detective sergeant's investigations also indicated that appellant was seen moving clothing and furnishings from the victim's apartment on the day he was shot. He learned from the criminalist that the probable weapon was a Ruger .22 semiautomatic. By February 28, 1980, appellant was a suspect in the detective sergeant's mind.

On February 28, 1980, a search warrant for appellant's residence and vehicle was obtained and served. The officers found belongings of Pollock and letters from appellant addressed to the victim, but no firearm. When appellant arrived at her residence at about 7 p.m., she was advised of her *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights by the detective sergeant. Appellant waived her rights and agreed to speak with him.[3] Appellant was questioned

---

[2]The February 20, 1980, court-reported statement was the first formal interview by law enforcement personnel.

[3]This was the second detailed interview by police officers.

regarding her activities prior to the shooting. She repeated her story and again denied knowledge that the victim had owned a gun. At the conclusion of this interview, which lasted two and one-half to three hours, the detective sergeant asked appellant if she would be willing to come to the sheriff's office the next day, February 29, to make a video tape reconstruction of the incident. Appellant said "she would be more than willing to do this if it would assist in the efforts to apprehend the individuals who had killed her Jerry."

On February 29, the victim's van was driven to the scene where the detective sergeant played the part of Jerry Pollock, another officer played the unknown suspect, and appellant played herself. The events were reenacted under appellant's direction and video taped. Appellant was not given *Miranda* admonitions prior to the video tape session; however, the reenactment showed the same version of the incident that appellant gave in her previous oral statements.[4] At trial, the video tape was played for the jury, with the detective sergeant narrating.

### Challenged Statements
### March 6th Statement

When the detective sergeant learned on March 5, 1980, from the criminalist that an expended cartridge was found inside the van and there was a likelihood that the bullets recovered were fired from a handgun of the type Pollock had owned, he telephoned appellant and made arrangements for a further interview at the sheriff's department on March 6. Appellant arrived at approximately 10 a.m. and accompanied the detective sergeant and another officer to the detectives' room where she was again advised of and waived her *Miranda* rights.[5]

The officers began interrogating appellant about 10:15 a.m. and, at approximately 12 noon, the detective sergeant confronted appellant with his belief that she was responsible for the victim's death and that the physical evidence did not support her story of the killing. Appellant became "upset, irate," and said the events had occurred as she had previously described them. The video tape equipment was set up and portions of the video reenactment were played for appellant while the officers pointed out various discrepancies. When the detective sergeant noted that the positions in which the shell casings were found were inconsistent with her story, appellant said that the assailant must have put the shell casing inside the van. The interrogation continued until approximately 1:55 p.m., when appellant was allowed to use the restroom facilities.

---

[4]The video-taped presentation was the third detailed questioning of appellant.

[5]This March 6, 1980, interview was the fourth formal interview; however, this interview was neither recorded nor reported by a court reporter.

After approximately 30 minutes, the detective sergeant and appellant returned to the detective's office where the sheriff joined them. The sheriff had known appellant for three to five years through their attendance at a Lemoore community church and through appellant's employment at a Christian bookstore in Hanford where the sheriff made purchases. The sheriff testified that he was not a close friend of appellant's, and saw her only occasionally because she attended church irregularly. However, a deputy sheriff, who participated in the initial investigation of the shooting, testified that at the Leal residence, the sheriff had explained that he wanted to talk to appellant alone: "He said that he had known her quite a period of time and that he thought he could talk to her and calm her down, because she appeared to be upset."[6] The detective sergeant had briefed the sheriff about appellant's case on a daily basis throughout the investigation. Prior to the March 6 interrogation, the detective sergeant had informed the sheriff that he would be questioning appellant again. The sheriff told him that if appellant did not tell the truth on this occasion, the detective sergeant should call him "to see whether or not [the sheriff] couldn't solicit the information that [the officers] needed."

The interview with the sheriff was the subject of an extensive pretrial suppression hearing before Judge Rosson in Kings County. The sheriff testified that he first inquired whether appellant had in mind her *Miranda* rights; appellant indicated that she did. The sheriff then told appellant that he personally did not believe her story based upon his understanding of the physical evidence and appellant's behavior, specifically, her reluctance to look the sheriff in the eye and her failure to voice her innocence adamantly. Appellant again denied any responsibility for the shooting.

The sheriff suggested to appellant she was having a difficult time telling the truth because of their prior relationship through the church. The sheriff said he knew appellant professed to be a Christian and this might have caused her some embarrassment. He assured appellant that if she admitted the shooting of the victim, he would not be judgmental or think of her as less than a Christian or as "something ugly." He further stated that if she told the truth, he would have much respect for her courage. The sheriff told appellant that he was personally interested in being patient and listening to her tell the truth. He said there was accountability attached to her actions, that appellant knew this as a Christian, and should she continue to deny accountability for what he believed she had done, she would continue to have problems in experiencing more guilt. The sheriff knew that appellant was suffering from nervousness and was having difficulty sleeping.

The sheriff then referred specifically to the first chapter of Romans from the Bible,[7] indicating that "God is a merciful God" and interested in peo-

---

[6] The Kings County Sheriff later testified he had known her from five to eight years. He also admitted he had given advice to appellant on the telephone before the death of Pollock.

[7] The Epistle of Paul The Apostle to the Romans, New Testament, Bible.

ple's lives, and accordingly has given man "a set of rules and regulations to guide us in our human government and personal living habits." He explained that the Bible states that if an individual chooses to disregard those rules by refusing to submit to them, God will cause that individual "to just go their own way." In other words, God would turn his back on that individual who would become a "reprobate who can no longer distinguish between right and wrong."[8] In this connection, the sheriff referred to "living with somebody that wasn't your husband . . . ." He suggested that if appellant continued to pursue her course of action by denying culpability for the homicide, she was capable of experiencing the moral isolation and abandonment described in the Book of Romans.

The sheriff further stated that people who stopped living according to God's law are bound to suffer some form of discipline. He referred to a book by Jay Adams, a minister, entitled Competent to Counsel,[9] which includes a description of a young woman in a mental institution. Adams' thesis as explained by the sheriff is that the woman, diagnosed as a catatonic schizophrenic, was not mentally ill, but was suffering from a "sin factor" arising from guilt over an adulterous relationship. The woman was consumed by guilt because she was not living according to God's rules and God had begun to deal with her.[10] The sheriff told appellant that he believed her situation correlated with the woman described in the book. He further advised appellant that he believed she was a candidate for a nervous breakdown because she was not telling the truth.

During the course of this discussion, the sheriff and detective sergeant told appellant that they did not believe the victim intended to marry her; that all indications were he had no intention of marrying her and that he used her to enjoy a physical relationship. The sheriff admitted that he suggested that Pollock might have attempted suicide, although there was no evidence whatsoever to support this theory. "I was looking for something that would cause her to start to tell the story that would go along with the evidence that we knew existed. . . . I simply suggested that, I guess, be-

---

[8]The sheriff evidently was referring to ". . . reprobate mind.' (Ch. 1, verse 28, Romans, New Testament, Bible, King James Version.)

[9]The title of Jay E. Adams' book is evidently taken from Williams' version of Romans, chapter 15, verse 14 of the New Testament. "As far as I am concerned about you my brothers, I am convinced that you especially are abounding in the highest goodness, richly supplied with perfect knowledge and competent *to counsel one another.*" (Italics added.)
The King James version differs and reads: "And I myself also am persuaded of you, my brethren, that ye also are full of goodness, filled with all knowledge, able also to admonish one another." (Ch. 15, verse 14, Romans, New Testament, Authorized, or King James Version.)

[10]In fact the person the sheriff was describing in Competent to Counsel may have been "Mary," who was diagnosed as a "manic-depressive" and would "howl and cry and scream at the top of her lungs" when "counselors began to put their finger on the real issue in Mary's life (which turned out to be adultery with her next-door neighbor) . . . ." (Adams, Competent to Counsel (1970) at pp. 33-34.)

cause there wasn't really much else to say that would encourage her to tell the truth."

At that point, appellant for the first time indicated that her story might not be true, but stated that she did not want to spend the rest of her life in jail. The sheriff responded that no one present in the room could tell her how much time she would spend in jail, only a judge could make that determination as a result of hearing the evidence. However, the sheriff did state that in some instances people spent as few as "four to seven years" in jail as a result of killing another person.

The detective sergeant testified that at one point he told appellant that "if it was hard for her to think that she had actually shot him, make it easier on herself by saying the gun had done the actual shooting rather than herself."

Appellant then admitted for the first time that she shot the victim and disposed of the gun. She said that the victim had become distraught over his divorce and the loss of his little girl and pulled the gun from under the seat of the van. Appellant said that the gun went off when she struggled with the victim to keep him from pointing it toward himself. When the victim got out of the van, appellant tried to empty the gun by shooting the bullets into the air. Appellant admitted that she concealed the gun in her purse and then in her bedroom, and threw it in a canal the next day. Appellant also admitted that the stranger-assailant story was a lie made up because appellant was "afraid you guys wouldn't believe me."

At approximately 4 p.m., appellant went with the officers to a canal on Java Avenue where the gun was recovered. They returned to the sheriff's office and a court-reported statement[11] was taken beginning at 5:45 p.m. and ending at 6:15 p.m. This statement also was read into the record at trial over defense objection and contains the admissions noted above. Under this version of events, appellant maintained that the shooting was a complete accident and the gun was placed in the van by Pollock. Appellant then was asked if she would take a polygraph examination. Appellant agreed to do so and wished to take it immediately; however, because the officers were unable to locate a polygraphist that evening, appellant agreed to appear for the examination on Monday, March 10, 1980, in Fresno. The officers provided appellant with food which she was unable to eat; she was allowed to go home.

### March 10 Statement

On March 10, 1980, appellant appeared at approximately 3:30 p.m. at the Fresno Police Department for the polygraph examination. An officer of

---

[11]This court-reported statement on March 6, 1980, taken after the unrecorded interview with the sheriff, was the fifth formal interview and interrogation.

the Fresno Police Department advised appellant of her constitutional rights and obtained oral and written waivers; he then administered the polygraph test, asking four questions based on appellant's most recent statement. The questions were: "Did Mrs. Dunlap tell you to meet her on 19th Avenue?"[12] "Did you shoot Jerry on purpose?"; "Did you ever see that gun in Jerry's apartment?"; "Do you know how that gun got into the van?"

Appellant first repeated her story that she and the victim were at the intersection to meet Mrs. Dunlap, and denied shooting the victim intentionally, seeing the gun in his apartment, or knowing how it got into his van. After appellant repeated these responses several times, the officer confronted her with the results of the polygraph, which indicated that she was being deceptive. Eventually appellant said she was lying and changed her story. The officer testified that appellant then admitted that she shot the victim intentionally.

At that point, because the officer knew appellant was changing her story, he took her to an interrogation room containing a concealed recording device and continued the conversation.[13] Appellant admitted that she met no woman at the mall, there was no rental house, and that she made up the story in order to get the victim into the country to talk with him. Appellant said that Pollock had asked her to marry him, but told her the day he was shot he was "having second thoughts." She admitted she took the gun from the victim's dresser, put it in her purse, and brought it with her when she and the victim met. She picked up the gun and tried to scare Pollock; it went off when he started shaking her. Appellant said she had both hands on the gun and squeezed the trigger; however, she insisted that she did not intend to shoot him, saying, "[I]t went off so easy."

The entire March 10 taped statement was played to the jury at trial.[14] Defense counsel objected to the March 10 statement and all other statements made after March 6, 1980, as fruit of the poisonous tree. At the close of the March 10 statement, appellant was arrested for "suspicion of homicide."

Dr. Charles A. Davis, a physician and psychiatrist, interviewed appellant at the request of law enforcement at 7:15 a.m. on March 11, 1980; it was the morning after the taking of the damaging March 10 taped statement. Appellant was hospitalized for asthma and was receiving an intravenous drip and oxygen when Davis saw her; she had received medication the night

---

[12]Appellant was still claiming that there was a Mrs. Dunlap who had a house to rent; Adams claimed that she and Pollock had gone to 19th and Idaho on the night of the killing to meet Dunlap regarding the house.

[13]This March 10th recorded interrogation was the sixth formal interview.

[14]We have reviewed the tape and transcript which are a part of the appellate record.

before. Appellant appeared to be oriented and coherent and gave a statement about the killing similar to that of the previous evening.

The jury was instructed on excusable homicide committed by accident and misfortune, voluntary manslaughter committed upon a sudden quarrel or heat of passion, involuntary manslaughter, and both degrees of murder. After approximately three hours of deliberation, the jury returned its verdict finding appellant guilty of first degree murder.

## Discussion

■ ■■ ■ The central questions in this appeal are whether appellant's March 6 statement to the sheriff and sheriff's officers was voluntary; whether subsequent statements and the gun were the products of illegality; and whether if error occurred in introducing coerced admissions, the error requires reversal.[15] ■ Appellant contends that her court-reported statement to officers on March 6, 1980, and all her subsequent statements were the result of improper psychological coercion by the Sheriff of Kings County. Specifically, appellant argues that the cumulative effect of the sheriff's reliance on his friendship with appellant, his knowledge and use of her religious beliefs, and his suggestion that appellant might end up in a mental institution if she did not tell the truth rendered appellant's admissions involuntary. We find appellant's argument persuasive.

" '[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . and even though there is ample evidence aside from the confession to support the conviction.' *Jackson* v. *Denno* [1964] 378 U.S. 368, 376, . . . The reasons for excluding a coerced confession were explained fully by the court in *Jackson*. First, confessions obtained in a coercive manner are likely to be unreliable. More important, involuntary confessions are forbidden 'because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will" [citation] and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano* v. *New York* [1959] 360 U.S. 315, 320-321 . . .' [cited in] *Jackson,* 378 U.S. at 386, . . .

---

[15]Respondent's initial argument that appellant waived any objection to the admission of the challenged statements by failure to raise a timely objection in the trial court lacks any reasonable foundation in the record. There was no waiver as shown by our earlier description of the posture of the case. Defense efforts to suppress appellant's admissions refute any theory of waiver.

■ "In order to be voluntary, a confession must be 'the product of a rational intellect and a free will.' [Citation.] The fifth amendment secures 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.' *Malloy* v. *Hogan* [1964] 378 U.S. 1, 8, . . . . Consequently, a confession 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, *nor by the exertion of any improper influence.*' [Citations; italics added.]

"A confession is involuntary whether coerced by physical intimidation or psychological pressure. [Citation.] Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. *Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.'* As the Supreme Court noted in *Malloy*, '[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed.' [Citations.]" (*United States* v. *Tingle* (1981) 658 F.2d 1332, 1334-1335.)

■ "Confessions obtained by coercive practices which overcome the will of the person confessing are tainted, and both the confession and its products will be suppressed." (*People* v. *Andersen* (1980) 101 Cal.App.3d 563, 574 [161 Cal.Rptr. 707].) The cases require a rigorous standard of review: this court must " ' "examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found." ' " (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672]; see also *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 753 [175 Cal.Rptr. 738, 631 P.2d 446].) Where the evidence is in conflict, this court must accept the trial court's resolution "unless the evidence relied on by the trial court is so improbable as to be entirely unworthy of belief." (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 607; *People* v. *Davis* (1981) 29 Cal.3d 814, 826 [176 Cal.Rptr. 521, 633 P.2d 186].)

■ In determining the question of the voluntariness of appellant's statements, this court is required to consider the *entire* record below. (*Davis* v. *North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898, 86 S.Ct. 1761]; *People* v. *Stroud* (1969) 273 Cal.App.2d 670, 674, 682 [78 Cal.Rptr. 270].) We must examine "all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041], quoted in *People* v. *Hogan* (1982) 31 Cal.3d 815, 841 [183 Cal.Rptr. 817, 647 P.2d 93].)

■ We first discuss whether the record supports the Kern County Superior Court's ruling that appellant's March 6 statement was voluntary. We

are reviewing facts which are largely uncontradicted. For purposes of our discussion we accept the sheriff's rendition of his approach to the admissions obtained from appellant.

Appellant was 32 years old at the time of the shooting and was 33 on March 7, 1980; she was 5 feet 2 inches tall and weighed approximately 110 pounds. She dropped out of school after completing the 11th grade to marry her first husband. The couple had two daughters, who were removed from appellant's custody in January 1980, and placed with their father. After a divorce, appellant married a much older man, whom she divorced in 1977.

Appellant was manager of a Christian bookstore in Hanford from 1973 to 1978. Thereafter, she managed a mobilehome park for two years; at the time of her arrest she was unemployed. Appellant was reared as a member of the Catholic church but at the time of the offense belonged to the Church of God. She testified that she was a Christian and her pastor testified that he and appellant shared the same Christian beliefs. The sheriff said, "I knew that Nancy professed to be a Christian" and "because of her background, I knew that she had a knowledge of the scriptures." Appellant had no known prior history of criminal behavior.

There is uncontradicted evidence that appellant suffered from severe chronic asthma, a condition for which she took frequent medication. Appellant said that on March 6 she was feeling "[v]ery weak" and her "chest was very tight." The detective sergeant testified that appellant took medication during a break in the interrogation, but remained alert.

The main details of the March 6 interrogation as reported by the sheriff and the detective sergeant are set out above in the summary of trial evidence. The record reveals the following additional circumstances. The interview at the sheriff's department on March 6 was the fifth time appellant had detailed the shooting at the officers' request. The interview took place in a room approximately 20 feet by 20 feet, with one wall of glass facing a garden. There were two doors which were locked to prevent entry, but could be opened from inside. The room contained four desks and six chairs; appellant sat in one of two soft, cushioned armchairs in front of the sergeant's desk.

Except for requesting a break to use the restroom, appellant did not ask to discontinue the interview or to go home. The sergeant claimed that the interview was not tape recorded because of lack of facilities.

The sheriff said appellant told him she was having difficulty sleeping and could not eat. During the time the sheriff interrogated appellant, she was emotional and anxious, with facial expressions "just short of crying. . . ."

Appellant testified that when she saw the sheriff on March 6, she was very glad because she regarded him as a friend.[16] The sheriff told her about the woman in Jay Adams' book who was in a mental institution from guilt feelings because she had sinned by living with a man not her husband. The sheriff then said appellant's case was similar; appellant said she felt "very bad" about this and feared a similar fate. Appellant testified that she considered herself a sinner at that time because she had been living with Pollock; she changed her story because of fear of going to a mental institution and fear of "[e]ternal damnation." She did not believe the sheriff had the power to condemn her to eternal damnation, "but God certainly does." Appellant had not been threatened with physical harm at any time by any of the officers. The sheriff testified that "[Jay E. Adams] points out that people who are in mental institutions are not there because they are mentally ill, but because of the fact that they . . . have been unable to deal with the guilt that is associated with sin as described in the scriptures. I mentioned that to Nancy, because I knew she would understand that."

The trial judge characterized the sheriff's approach as "religious persuasion to tell the truth," and ruled that in the circumstances of this case, where *Miranda* warnings were given and appellant was not "close to being an imbecile," there was no improper coercion. Accordingly, the court found the statements voluntary and denied the motion to suppress.

Respondent reasons, as did the trial judge, that there was no improper inducement or coercion because the sheriff's remarks are in the nature of intellectual persuasion. Specifically, respondent contends that the "inducement" contained in the sheriff's comments was merely "philosophical or intellectual persuasion to tell the truth," and not the equivalent of coercion. However, accepting as true the sheriff's version of his remarks, the totality was not purely intellectual persuasion, but an overwhelming and calculated appeal to the emotions and beliefs, focusing appellant's fears in an area the sheriff knew appellant to be particularly vulnerable. The accused's statement must be entirely self-motivated: "If the pressure or inducement was 'a motivating cause' of the decision to confess, the confession is involuntary and inadmissible as a matter of law." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 327-328 [165 Cal.Rptr. 289, 611 P.2d 883].)

We recognize that mere exhortations to tell the truth are not improper coercion. "The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as repre-

---

[16]We note that the sheriff stated Nancy Adams had telephoned him some weeks before the shooting for advice for a friend who was considering kidnaping his daughter. The sheriff talked with appellant about the problem and advised her.

sented by the police. Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" *unaccompanied by either a threat or a promise,* does not render a subsequent confession involuntary. [Citation.]' " (*People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908], italics added, quoted in *People* v. *Jackson* (1980) 28 Cal.3d 264, 299 [168 Cal.Rptr. 603, 618 P.2d 149].)

In *People* v. *Hill, supra,* 66 Cal.2d 536, 547-548, the defendant, in custody, alleged that the investigating officer "urged him to consider his own position as against that of his codefendants and, in effect, to desert a sinking ship and 'grab a life-saver' if he could, as he might expect his codefendants to do." The defendant in *Hill* argued that his statements were induced by an implied promise of leniency in the officer's remarks. The court noted that the officer also told defendant the facts that the investigation had uncovered at that point, "and, so far as it appears, gave [defendant] no false information. The record fails to disclose that any of the officers present made any threat or promise of leniency, although they urged that [defendant] 'help himself.' " (*Id.,* at p. 548.)

In *People* v. *Ditson* (1962) 57 Cal.2d 415, 433 [20 Cal.Rptr. 165, 369 P.2d 714], the interrogating officer urged the defendant to help himself by explaining the dominant role of his copartners in the crime. The Supreme Court held that defendant's confession was free and voluntary and the mere fact the officer urged the defendant to "clear up the details" of his own and another's relative positions and activities in the crime did not show overreaching. The court said: ". . . *We recognize, of course, that coercion can be psychological as well as physical. But in this we must exercise great care not to become confused: intellectual persuasion is not the equivalent of coercion.*" (*Id.,* at p. 433, italics added.)

Appellant's interrogation is clearly distinguishable from the questioning in *Hill* and *Ditson* in that it contains elements in addition to urging appellant to tell the truth, clear her conscience or help herself. (See *People* v. *Andersen, supra,* 101 Cal.App.3d 563, 579.) Here, the interrogators knowingly employed pressures which were a "motivating cause" of appellant's admissions. (See *People* v. *Thompson, supra,* 27 Cal.3d 303, 327-328.)

The judge who conducted the pretrial suppression hearing in Kings County Superior Court recognized that there is something basically wrong about using religion as a means to induce a person to confess. "[R]eligious persuasion cannot be a part of police tactics. She should not be told that she is a sinner or that she can go to hell, and even possibly lose her mind for doing the things that she was alleged to have done (living with the victim without the benefit of marriage and not telling the truth as to what took place on the night of the killing)." In denying the motion to suppress the judge failed to recognize the obvious effect of this "improper influence."

(*Malloy* v. *Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 659, 84 S.Ct. 1489], quoting *Bram* v. *United States* (1897) 168 U.S. 532, 542-543 [42 L.Ed. 568, 573, 18 S.Ct. 183].)

Respondent urges us to focus upon the *nature* of the benefit as represented by the police that appellant was to receive if she told the truth. In this case, says respondent, appellant's benefit exists only in the sphere of her own moral rehabilitation. Therefore, respondent contends no leniency or advantage was offered nor retribution threatened by the police. The argument is specious. The significant factor is the *tactic* of exciting the suspect's deep-seated fears, not the source or agency of the threatened harm. The sheriff purposely played on appellant's religious anxiety and specifically her fear of being incarcerated in a mental institution, because of the "sin factor." He suggested that she would be eaten up by guilt like the woman in Jay E. Adams' book, who was in a mental institution because "God had begun to deal with her" sin of having a sexual relationship with a man to whom she was not married.[17]

The sheriff told appellant he believed she was a candidate for a nervous breakdown because she would not tell the truth. The sheriff well knew appellant's vulnerabilities; their relationship was sufficiently close for her to call the county sheriff for advice in counseling a friend and to receive advice.[18] He had known her in church and at the Christian book store when she worked there. He testified he knew appellant would understand when he spoke of "sin" and "guilt." We can infer he meant Nancy Adams, in particular, would understand those terms. To bring appellant's profound

---

[17]A reading of Jay E. Adams' book, Competent to Counsel, illuminates the sheriff's approach to interrogating Nancy Adams and his acquaintanceship with the art of "nouthetic counseling" as discussed throughout the book. Nouthetic is a word of Greek origin, from the noun "nous" meaning mind and "thet," a derivative of the verb to place or put, i.e., to put the thought in one's mind or to place in one's mind. On page 175 of the book are the following paragraphs:

"God sent Nathan the prophet to yank a confession out of David. But Narramore protests, 'yanking hurts.' Of course, yanking hurts; nobody denies that, but abscessed teeth hurt too, and in the long run do far more damage. The point of the psychosomatic Psalms (51, 32, 38), as David clearly indicated, is that God makes us miserable when we hold within the guilt of unforgiven sin. He therefore urged his readers not to be like the stubborn mule that has to be dragged to confession. What hurts most is not the yanking, but the sin which caused the condition in the first place. Wherever sin exists there will be pain. Confessing sin hurts one's pride. It is vain to attempt to avoid this fact, or try to devise some painless method of extracting confessions. Moreover, the way to handle personal problems is not to determine whether one method may be more or less painful than another. In the long run, the 'yanking' method must be adopted simply because God calls us to an immediate confession of sin. It is wrong to advise anyone to postpone the confession of sin. Under no circumstances can such advice be justified biblically.

"Nouthetic counseling is also preventive. Not only is it important to deal with the tooth that has abscessed and must be pulled, but it is important too to fill teeth and try to preserve them. Both extraction and drilling are painful processes, but both are necessary. Nouthetic counseling is prepared to handle both situations."(*Id.*, at p. 175.)

[18]The sheriff said of his prior association with appellant: "Perhaps that rapport could assist me in getting information that we needed."

fears to the surface of her consciousness, he suggested that appellant would be consumed with guilt because she had sinned and refused to conform to God's law. It can be inferred from the sheriff's testimony that he was aware of no more compelling fear for one who sincerely believed in the tenets of their shared religion than the fear of God's "turn[ing] his back" on that person.

Religious beliefs are not matters to be used by governmental authorities to manipulate a suspect to say things he or she otherwise would not say. The right to worship without fear is too precious a freedom for us to tolerate an invasion and manipulation by state officials of the religious beliefs of individuals, including those accused of crime.

Furthermore, the sheriff's speech in this case is analogous to conduct condemned in *Spano* v. *New York* (1959) 360 U.S. 315 [3 L.Ed.2d 1265, 79 S.Ct. 1202] and in *United States* v. *Tingle, supra,* 658 F.2d 1332, because it displays a police tactic of delving into a suspect's psyche to find some area of special vulnerability and then concentrating on it to extract admissions. In *Spano,* the police exploited the defendant's friendship and concern for a particular rookie officer; in *Tingle,* the police purposely caused a mother to fear that if she failed to cooperate, she would not see her young child for a long time. The intrusion in this case, which focused on the suspect's religious anxieties, is no less offensive. The police must not be encouraged to probe into each suspect's personality to discover the means of psychological coercion.[19]

Here the "reprobate mind"[20] lecture was combined with the suggestion that failure to confess might well lead to mental illness, which together with other objectionable tactics, overwhelmingly establish impermissible coercion. The sheriff knew that appellant was ill and had guilt feelings concerning her relationship with the victim while unmarried. His warning appellant that her unexpiated guilt could lead to her commitment to a mental institution was not mere intellectual persuasion to tell the truth. Also present were elements of "softening-up" (see *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 158-161 [141 Cal.Rptr. 698, 570 P.2d 1050]), exploitation of friendship and deception. The sheriff admitted that he brought up the possibility of Pollock's suicide, without any evidence to support such a theory, and appellant immediately seized upon this suggestion. The detective sergeant's comment that "if it was hard for her to think that she had actually shot him, make it easier on herself by saying the gun had done the actual shooting rather than herself" adds to the improper persuasion.

---

[19] " '. . . for everyone there is something unendurable—something that cannot be contemplated.' " (Orwell, 1984 (New American Library 1949) p. 234.)

[20] Romans, chapter 1, verse 28, New Testament, Bible, King James Version.

We are not impressed with respondent's final argument that appellant's will was not overborne because her admissions appear calculated to meet the prosecution evidence which was irreconcilable with her earlier story. Under the law, the crucial question is whether appellant would have made *these* damaging admissions leading to still more incriminating statements, without the improper pressure. The record does not support such a conclusion.

Respondent overlooks appellant's several previous opportunities to change her story when confronted with the prosecution evidence. As the detective sergeant testified at the pretrial hearing, "During the time in the break in the afternoon . . . after we had talked to her . . . it was . . . obvious that even with the presentation of the facts . . . she was going to stay with the same story . . . ." Appellant adamantly denied any part in the shooting until after the sheriff's speech. Appellant's admission that she held the gun and disposed of it afterward immediately followed the "religious persuasion" dialogue.

Based upon an independent examination of the record, we cannot agree with the trial court's conclusion that appellant's will was not overborne by coercive police tactics. The prosecution has not met its burden of showing that appellant's statements were voluntarily given. (*People* v. *Hogan, supra,* 31 Cal.3d 815, 841-843; *People* v. *Jimenez, supra,* 21 Cal.3d 595, 608.)[21] Appellant's March 6 admissions "were the involuntary end product of coercive influences and are thus constitutionally inadmissible in evidence." (*Davis* v. *North Carolina, supra,* 384 U.S. 737, 752 [16 L.Ed.2d 895, 904].)

█ We next confront the question whether the gun and the March 10 statement, which contains the most damaging admissions, also must be suppressed. The record shows that they must be.

Appellant and her mother testified at the pretrial hearing on the motion to suppress that appellant was exhausted from an asthma attack and lack of sleep and was under the influence of drugs when she gave the March 10 statement. Appellant testified that she had taken Dalmane, meprobamate and

[21]Respondent filed a supplementary brief in February 1983 urging that the California Criminal Justice initiative which added section 28, subdivision (d), of article I to the California Constitution is retroactive and contending therefore that the standard of review for determining the voluntariness of an admission is the preponderance of the evidence test as declared by the United States Supreme Court (*Lego* v. *Twomey* (1972) 404 U.S. 477, 488-489 [30 L.Ed.2d 618, 626-627, 92 S.Ct. 619]) rather than the standard of *People* v. *Jimenez, supra,* 21 Cal.3d 595.

We need not discuss respondent's request for a determination of that issue relating to the initiative which is now before the California Supreme Court. We find that under either test, it is impossible to find sufficient support in the record that appellant's admissions were voluntary. The type of coercion discussed here is gross; neither standard has been met by the prosecution—beyond a reasonable doubt or by preponderance of the evidence.

Norflex on the morning of the polygraph session and did not remember going to the Fresno Police Department, taking the polygraph, or giving a statement. Judge Rosson, who first ruled on the suppression motion in Kings County, expressly rejected this testimony as not credible in light of the contrary testimony of the officers present and the testimony of Dr. Davis.

Accepting the evidence most favorable to the ruling below, the proceedings on March 10 were not *independently* coercive. However, appellant only argues that the seizure of the gun and the March 10 statement should have been suppressed as *fruit* of the poisonous tree. The record does not support respondent's assertion that the March 10 statement was given voluntarily by appellant independent of the prior illegality. "The rule has been long and well settled in this state that where a defendant, subjected to threats, violence or other improper influences, makes a confession or other incriminating statement in such a coercive atmosphere and shortly thereafter again incriminates himself under circumstances not manifestly coercive 'there is a presumption that the influence of the prior improper treatment continues to operate on the mind of the defendant and that the subsequent confession is the result of the same influence which rendered the prior confession inadmissible, and the burden is upon the prosecution to clearly establish the contrary. [Citations.]' [Citations.] Almost a hundred years ago, this court clearly expounded this rule in the *Johnson* case where an interval of *two days* occurred between the involuntary statements of the accused and subsequent statements introduced against them at trial: '[It] is equally clear that if their confession or statement, made before the examining magistrate two days thereafter, was a repetition of the statement [involuntarily] made to the Sheriff, or any material portion of such previous statement, the entire statement or confession made to and before the examining magistrate should have been excluded as evidence, by reason of the same having been originally made under such inducements held out to them as to exclude the first confession. *The law presumes the subsequent confession to have been made and influenced by the same hopes and fears as the first,* and this presumption continues until it is affirmatively established by the prosecution that the influences under which the *original confession* was made had ceased to operate before the subsequent confession was made. [Citations.]' (Italics added.) (*People* v. *Johnson* [1871] 41 Cal. 452, 454-455.)' (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 574-575 [75 Cal.Rptr. 642, 451 P.2d 74].)

Applying this standard, it is clear that the gun was a product of the improperly induced admissions; as soon as appellant admitted its existence, she accompanied officers to retrieve it. There is no hint of a break in the causative chain. (*People* v. *Johnson* (1969) 70 Cal.2d 541, 547-548 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].)

Respondent's argument that the record shows the March 10 statement to be independent from any improper influences is unconvincing. Appellant

agreed to take a polygraph test *before* she left the sheriff's department on March 6; the appointment was set for March 10 only because a polygraphist was not available the evening of March 6. Appellant testified that she agreed to take a polygraph test at the sergeant's request because she felt she had no choice. The factors that appellant subsequently signed a written form agreeing to be examined of her free will without coercion, that she knew she could refuse to participate, and that she was aware of her *Miranda* rights, do not establish a break in causation.

Significantly, the four questions asked by the police officer during the polygraph examination were taken directly from the March 6 statement and were aimed at the vulnerabilities in that statement. When appellant's answers, consistent with the March 6 story, indicated deception, the officer confronted appellant with the results. Appellant then made further admissions and gave yet another statement. It is apparent there was no sufficient showing of a " 'break in the causative chain' " as to the gun, the March 10 statement, or the March 11 statement to Dr. Davis made at 7:15 a.m. while appellant was hospitalized for asthma. (*People* v. *Hogan, supra,* 31 Cal.3d 815, 843.) The gun and all subsequent statements, as well as the March 6 statement, should have been excluded.[22]

■ Respondent does not argue that if the March 6 and 10 statements and the gun were admitted in evidence improperly, the error was not prejudicial. Respondent's failure to argue the point must be viewed as a concession that if error occurred, reversal is required.

■ Appellant's statements are admissions rather than a confession because, even in the March 10 statement, appellant continued to allege facts amounting to a claim of mitigation, and never unequivocally admitted first degree murder. (See *People* v. *Maynarich* (1978) 83 Cal.App.3d 476, 481 [147 Cal.Rptr. 823].) Although the improper introduction in evidence of a confession is prejudicial error per se, erroneous introduction of an admission is prejudicial unless shown to be harmless beyond a reasonable doubt. (*People* v. *McClary, supra,* 20 Cal.3d 218, 230.)

■ The trial record contains an abundance of circumstantial evidence, apart from the challenged statements, that appellant shot Pollock, for classic

---

[22]We commend any public servant who wishes to improve his or her counseling skills or to better his or her personal or moral fiber by study and research according to conscience and choice. However, a state law enforcement officer conducting an interrogation of one accused of crime may not use his own or the suspect's personal religious beliefs as a tool to extract admissions of guilt.

motives.[23] Appellant's false statements to the police conflicted with the

---

[23]Appellant and the victim had a brief, intense and stormy relationship which Pollock was attempting to terminate; appellant refused to accept that the relationship was at an end. The victim had been in the Navy, stationed at Lemoore Naval Air Station. In October 1979, he separated from his wife, Donna, who took their four-year-old daughter to Idaho. He then began a sexual relationship with Mrs. Linda Burns, a neighbor.

Appellant, whose fiance had broken their engagement, asked her neighbor, Ellie Fruit, to introduce her to Pollock. The Fruits invited Pollock and appellant to dinner on December 13, 1979; thereafter, appellant and Pollock began seeing each other "a lot." Even though Mrs. Burns knew Pollock dated appellant occasionally in December, the Burns-Pollock relationship continued.

Pollock's divorce became final in January 1980. Pollock repeatedly told his sister that he wanted to start over with Donna and their daughter; he did not mention appellant. He told one friend that appellant was a pest and he wished she would leave him alone; he thought she was crazy. Pollock told another friend that appellant wanted to live with him, but that living with or marrying someone was not in his plans. About that time, appellant wrote a poem about the relationship with a note at the bottom, "Written for Jerry Pollock by Nancy Adams, January 7, 1980. Dear God don't let it be over—not yet."

On February 3, 1980, Pollock talked on the telephone with his sister about making a new life with Donna and his daughter. Pollock said he would never marry anybody but Donna. On February 5, 1980, Pollock went to appellant's house for dinner. They made love, and when he started to leave appellant became "hysterical," and Pollock took her to the Fruit house next door at about 11:30 p.m. and asked Mrs. Fruit to keep appellant there. They were having an argument and he wanted to leave. However, appellant went running after him again, screaming for him not to leave. The argument continued a long time before Pollock finally left. Appellant was angry and told Mrs. Fruit that "if she couldn't have him, nobody else would." Appellant started screaming and ran home. Later that night, appellant walked to Pollock's home and he let her in. After Pollock left in the morning, she wrote a letter indicating that she knew he needed "some space, time alone, away from [her]" and that she wanted to continue the friendship. On February 9, 1980, appellant mailed a letter and a card stating that when he said he was leaving she suddenly felt panic. She begged him not to "shut the door" on her, and said that she could not take losing him and physically was unable to handle losing him.

February 16, 1980, the Saturday before the shooting, Pollock and Mrs. Burns spent the evening playing cards with friends, the Montoyas. Pollock repeated his desire to become reunited with his wife. Pollock told Burns that he had finally explained to appellant that he did not want to see her anymore. He also stated that he did not trust her and did not want his daughter around her.

Pollock and Burns stayed at the Montoyas until 2 or 3 a.m. The four made plans for a Mexican dinner the following Saturday. Pollock then stayed with Burns until about 4 a.m. They planned that he would return Tuesday or Wednesday to help Burns with some odd jobs.

Appellant went to a wedding on Saturday, February 16, with Charles Kerr. She told him that she and Pollock planned to marry, but also that she suspected Pollock had another girl.

The next morning, Sunday, February 17, Pollock's neighbors saw him start to leave the apartment between 9 and 10 a.m. Appellant pulled into the parking lot "real fast," jumped out of her car, and opened the van door, saying, "'I've got to talk to you right now.'" Appellant was "agitated and angry." When the neighbor returned from getting a paper, the two were gone.

Monday morning, February 18, Pollock visited longtime friends. Pollock told them he had heard from his wife, who was the most important woman in his life. He also said that a girl he had been seeing was "'bothering'" him, calling him constantly, and that he had to take the phone off the hook; he left the house that day because of it. He and his friends played golf. Before Pollock left his friends at about 6:30 p.m., he mentioned that he was hoping that his wife would bring his daughter out; he was looking for a house because 'he hoped to persuade his wife to come back.

Monday evening, appellant told Mrs. Fruit that she and Pollock were going to be married. She requested that Ellie not tell Mr. Fruit, as it was to be a surprise.

On the day of the shooting, Tuesday, February 19, appellant called Pollock at work at

physical evidence and other witnesses' evidence of the time framework. The condition of the victim's body and the absence of a gun permitted inferences to support a finding of premeditation.

However, the significance of the challenged admissions is overwhelming. The March 10 statement established not only that appellant shot the victim, but also that appellant brought the gun with her to the prearranged meeting with the victim. This fact is very strong evidence of first degree murder, and without this evidence much more is left to inference. Furthermore, even with appellant's admissions, the first jury could not agree on a verdict and a mistrial was declared. Without the admission that appellant brought the gun to the meeting, the trier of fact might have concluded that appellant arranged to meet with the victim to talk, to try to persuade him not to terminate the relationship, and that the homicide took place accidentally or upon a sudden quarrel.

Appellant testified in her own defense that Pollock was shot while she struggled with him over the gun, and she did not intend to shoot him. Appellant said she and the victim saw each other often after they met in December, although for extended periods of time she did not see him. Appellant claimed she spent the weekend prior to the shooting with the victim and he asked her to his apartment about 3:10 that Sunday morning. They had gone "several places" together that weekend until he left for golfing on Monday morning. Appellant claimed that during that weekend Pollock had for the first time said he loved her and remarked, " 'I give up, will you marry me and be my wife?' "

---

about 10:30 a.m.; he said , " 'Nancy, I ain't got time for this bullshit.' " At noon, appellant came to see him while he was having lunch. Pollock walked her to the parking lot, and when he was coming back a fellow worker asked if he and appellant were "getting back together or something?" Pollock replied, " 'No. I want nothing to do with her. I'm having nothing to do with her at all.' " Pollock was "upset" and said " 'I wish that this woman would leave me alone and get out of my life.' "

That afternoon, appellant moved Pollock's possessions from his apartment to hers. Her father helped her; she told him Pollock and she were getting married. Appellant had a key; her father thought she returned it to the manager of the apartment house when the moving was completed. At about 5:15 p.m., appellant called Mr. Fruit, who was working with Pollock, and asked when Pollock was going to be home. Appellant said she had a surprise for Pollock and asked Mr. Fruit not to say anything about it. A few minutes later, Pollock got a call and came back in a "good mood." He appeared "excited" and said he had just been told about a house he could get rent-free if he would keep it up; he had to meet a woman about it at 7 p.m.

That evening Pollock left work after 6 p.m. with Arthur Chovich. He stopped on 18th Avenue in Lemoore at a car wash where appellant was waiting. Pollock was happy about the house, but was afraid he might miss the 7 p.m. meeting time. Appellant told him they did not have to arrive until eight and that "the lady" would meet them there. Appellant got into the van. Pollock had offered earlier to give Chovich a ride home. After Pollock got the phone call about the house, he told Chovich that " 'he'd have to go see this house, would [Chovich] mind going with him?' " When he heard the 8:00 time, Chovich asked to be taken home first. Pollock did so and left Chovich's house in Lemoore with appellant shortly after 7:10 p.m.

Appellant testified that on the day of the shooting Pollock asked her to have lunch with him and at noon expressed "second thoughts" about the marriage. She said she was upset and angry, but went to "finish" moving his things, as he had told her to "go ahead." Appellant testified that when she called Pollock at 6 p.m. she asked whether he was coming home to his house or hers. When he told her "neither," and refused to talk about it, appellant concocted the story about the rental house and Mrs. Dunlap to get him to talk with her.

After delivering Chovich to his home, appellant and the victim "ended up" on 19th Avenue where they stopped; it was raining. Appellant admitted to Pollock she lied about the house, and apologized. After some discussion, Pollock "came right out and said [they] weren't getting married . . . ." Appellant was shocked and hurt, and because she was crying, reached for her purse to get a Kleenex. Appellant instead picked up the gun which she had put in her purse after packing Pollock's things.

Appellant admitted she pointed the gun at the victim, holding it "somehow" with both hands. Appellant was "really, really mad" and told Pollock she wanted to know why he would not marry her, and had "played around" with her feelings. Pollock "slammed" his fist on the steering wheel, said " 'I've had it with everything' " and grabbed the gun. They struggled, Pollock pulled the gun toward himself and it went off. Appellant said that when the gun went off, Pollock's hands were on the gun barrel and her finger was not on the trigger. Pollock got out of the van and fell. Appellant fired one or two more shots; she said she aimed into the air to empty the gun.

Appellant attempted to move Pollock into the van and could not, so she tried to move the van up to him. Appellant said she did not intend to run over the victim, but saw he was under the van. Appellant then tried to roll Pollock out of the mud and water, and rolled him "quite a ways" into the road. Appellant then pulled the van up in front of Pollock "to protect" him. At that point the Oliveiras came along.

Appellant admitted the story she told about an unknown assailant was a lie. Appellant claimed she could not recall making a statement that she shot the victim intentionally.

Assuming arguendo that appellant would have been convicted of a homicide without the tainted admissions and evidence, there is no certainty the conviction would have been of first degree murder. The error in admitting the statements certainly is not harmless beyond a reasonable doubt and the judgment must be reversed.[24]

---

[24]Because we reverse the judgment on the ground that appellant's statements were coerced and inadmissible, we need not discuss appellant's remaining contentions.

The dissent ignores the testimony in the record which shows the sheriff knew the appellant well enough to perceive his counseling would hit the mark. As the United States Supreme Court said in *Rogers* v. *Richmond* (1961) 365 U.S. 534, 540-541 [5 L.Ed.2d 760, 766]: "[C]onvictions following the admission into evidence of confessions which are involuntary, *i.e.,* the product of coercion, either physical *or psychological,* cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." (Italics added.)

The judgment is reversed.

Zenovich, Acting P. J., concurred.

**WOOLPERT, J.**—I respectfully dissent. In reacting with less offense than the majority to the sheriff's religious technique in seeking a truthful confession, I am mindful of the description Justice Kaus has given to this appellate duty: "[W]e must of necessity perform a task for which we are not particularly well equipped—the determination how another person, whom we know only through the pages of an appellate record, was likely to act under certain stressful circumstances which none of us has ever experienced. Inevitably this exposes one to the charge of being a 'parlor shrink.' Yet this is precisely the kind of determination which courts are constitutionally bound to make and do make in case after case involving a claim that a confession was involuntary." (*People* v. *Hogan* (1982) 31 Cal.3d 815, 856 [183 Cal.Rptr. 817, 647 P.2d 93], conc. opn.)

In performing our appellate review we can find no better advice than that given twice in one volume of the reports, which is quoted at length:

"Mr. Justice Traynor in his concurring opinion in *People* v. *Garner* (1961) *ante,* [57 Cal.2d] pp. 156, 161-164 [18 Cal.Rptr. 40, 367 P.2d 680], ably enunciates the principles which should guide courts of all jurisdictions in resolving troublesome questions of the character of that at hand: 'Although questioning may sometimes be an easy substitute for scientific police work, it is also often essential to the solution of a crime and the conviction of the guilty. There may be no witnesses other than the accused, or the witnesses may be dead or unavailable. Thus, as Justice Frankfurter stated in *Culombe* v. *Connecticut,* 367 U.S. 568 [81 S.Ct. 1860, 6 L.Ed.2d 1037]: "Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly be-

gun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.

" ' "The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death." (*Id.,* at p. 1040 [6 L.Ed.2d]; see *Watts* v. *Indiana,* 338 U.S. 49, 57-62 [69 S.Ct. 1347, 93 L.Ed. 1801] (concurring opinion).) . . .

" 'The perpetrator of a crime is normally the one who knows most about it, and his confession, voluntarily made, is often the best evidence of his guilt that can be obtained. [Citations.] Only overwhelming social policies can justify the exclusion of such vital evidence. In the case of coerced confessions, the evidence may be unreliable; even if reliable, a free society cannot condone police methods that outrage the rights and dignity of a person whether they include physical brutality or psychological coercion. (See *Spano* v. *New York,* 360 U.S. 315, 320-321 [79 S.Ct. 1202, 3 L.Ed.2d 1265]; Maguire, Evidence of Guilt 109.) When a confession is voluntary, however, courts are reluctant to exclude it. "Interrogation *per se* is not, while violence *per se* is, an outlaw." [Citations.]

" 'As many commentators and courts have recognized there is a "compulsion to confess" to crime. Wigmore states the point colorfully: "The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature." (Wigmore on Evidence, 3d ed. § 851 at p. 319; see e.g., *Commonwealth* v. *Agoston,* 364 Pa. 464 [72 A.2d 575, 581, 583].) A psychiatrist explains the phenomenon of confessions in terms of subconscious but overpowering guilt feelings and desire for punishment. "There is . . . an impulse growing more and more intense suddenly to cry out his secret in the street before all people, or in milder cases, to confide it at least to one person, to free himself from the terrible burden. The work of confession is thus that emotional process in which the social and psychological significance of the crime becomes preconscious and in which all powers that resist the compulsion to confess are conquered." (Reik, The Compulsion to Confess, p. 267.)

" 'So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation.' " (*People* v. *Ditson* (1962) 57 Cal.2d 415, 433-435 [20 Cal.Rptr. 165, 369 P.2d 714].)

More recently, in a case involving much more aggravated facts than we review, including a technique sometimes called "brainwashing," the court's step-by-step analysis bears repeating. In *People* v. *Hogan, supra,* 31 Cal.3d 815, 834-844, the defendant objected to the admission of his statements to the police because of police promises of help, deceptive practices, and repeated references to his mental problems. The role of the appellate court is first stated at page 835: "This court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. (*People* v. *McClary* (1977) 20 Cal.3d 218, 227 [142 Cal.Rptr. 163, 571 P.2d 620]; *People* v. *Haydel* (1974) 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866]; *People* v. *Randall* (1970) 1 Cal.3d 948, 959 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74].) With respect to the conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' (*People* v. *Randall, supra,* 1 Cal.3d at p. 954.) The burden of proof which must be sustained by the prosecution on questions of voluntariness is proof beyond a reasonable doubt. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672].)"

The court then describes the nature of the interrogations, including the number of interrogations, their timing, the offer of help concerning mental problems, deceptive suggestions to defendant that he had been observed committing one of the homicides, the fact he was in custody throughout the time period in which the officers and defendant's wife confronted him with the enormity of his crimes, and his gradual mental deterioration as these pressures took effect. Of overriding significance, the officers were surreptitiously recording the private conversations between defendant and his wife. In these very enlightening privileged discussions defendant's wife emphasized his actions *could* have been done while he had gone "off the deep end just—all of a sudden and you're not above it and neither am I . . . ." He responded, "I just don't know. I couldn't stand myself to know that I did it in craziness because I still did it. That's what I'm afraid of. And if you did it, you did it, don't matter if you're crazy or not." (*Id.,* at p. 837.)

The next step in the court's analysis is to search for the *motivating* cause of the confession. A promise, express or implied, of leniency or advantage to the accused, invalidates the confession. The court then notes the difference between "mere exhortations by the police to a suspect to tell the truth" which are not improper, and express or implied promises of leniency. (*Id.,* at p. 839.) In *Hogan* an implied promise was found in the words "we would see what we could do to help [you]" and "maybe we can help you with *this part of the treatment* or you know *what might happen,*" because of the

implication of more lenient treatment. No such promises are involved in our case.

The court then considers the role of deception in the interrogation, noting that communication of false information independent of other factors does not make a confession involuntary, but when considered with other influences brought to bear on the accused, may overbear the will to resist so as to raise strong doubts that the statements were truly volitional. (*Id.*, at pp. 840-841.) However, no deception was employed in our case unless we take the sheriff's views on morality and religion and convert them from mere opinion into false expressions of fact. If we were to do so our "parlor" psychiatry would be off course.

As indicated in the concurring opinion in *Hogan,* "one must, of course, evaluate the deception's probable effect on a person who is, in fact, not guilty." (*Id.,* at p. 855.) And one must "consider just what type of confession follows the deception." (*Id.,* at p. 856.) In *Hogan* the concurring justice noted that the confession was not in a rational form, but instead consisted of "a series of emotional outbursts" which had no appearance of "a coherent description of the recollection of a past event." (*Id.,* at p. 858.) In contrast, if there was any deception in our case, it would be found in the continuing deliberate, self-serving statements of the defendant.

Having found implied promises of leniency, the *Hogan* court then turned to the separate issue of psychological coercion. A review of all the evidence, including the secretly recorded conversations between husband and wife, led to the conclusion that there had been "brainwashing" as a result of the police activity, reinforced by the wife passing along "confirming" information. (*Id.,* at pp. 841-843.) Our case has little resemblance to those aggravated circumstances.

It is important to keep in mind that the police method is not being studied in a vacuum. It is of little consequence how *we* would react to similar interrogations in the same circumstances. Because of the serious consequences of excluding the confession of facts which are often known only to the suspect, and immunity which might be the result of too strict an application of an "it would be better for you if you told what you knew" prohibition, we have been advised to exercise great care to determine that the alleged promise or threat was *in fact* an essential "motivating cause of the confession." (*People* v. *Ditson, supra,* 57 Cal.2d 415, 443.) Whether we review promises, threats, or subtle psychological persuasion which may have reached the level of "psychological coercion," the object of our scrutiny is the defendant who claims a due process violation.

Who finally determines the effect of police conduct on the suspect? On this question the appellate review law becomes hazy. As stated above in

*Hogan,* if there is conflicting testimony of any fact the appellate court must accept that version of the fact which is most favorable to the People if supported by the record. Usually the court reviews the uncontradicted facts and uses them to resolve the issue of voluntariness. However, it may be argued that since all of the circumstances must be examined, including the *effect* on the defendant of the pressures brought to bear by the interrogators, the bare facts of what was done or said to the suspect make up only a part of the whole. The effect on the defendant is the final factual question. Often it must be determined by drawing inferences from the operating facts. As we instruct jurors, "[e]vidence is either direct or circumstantial. . . . Both direct evidence and circumstantial evidence are acceptable as a means of proof." (CALJIC No. 2.00.) The trial judge's conclusions of fact—whether to the nature of the persuasion or to its effect on the suspect—are entitled to the same appellate deference if inferences must be drawn from conflicting facts.

When, as in this case, the defendant testifies that the conduct had a certain effect, and supports that conclusion by an emphasis on her debilitated mental and physical condition at the time of the interviews, and other testimony supports the inference that the defendant merely overstated her real condition and was in fact not overcome by the psychological persuasion, we should not disregard the decision of the trial court. (*In re Anthony J.* (1980) 107 Cal.App.3d 962, 973 [166 Cal.Rptr. 238].) In this case two judges closely observed the people involved, and although concerned about the use of religious suggestion, found beyond a reasonable doubt that the admissions were voluntary. Certainly it cannot be said that the People have conceded the effect on Nancy Adams was the same as she described. However, assuming that we are to draw the inferences and make the conclusions on an independent evaluation standard, the same result should follow in this case.

Murder is a dirty business which becomes only superficially less so when the parties reach the interrogation room. That is not to suggest that law officers should act accordingly. It is a reminder that the interrogators may delve into matters which on subsequent reading will offend our usual sensibilities. Some police conduct may be so objectionable that its effect is irrelevant; however, that is not the case here. We are faced with no facts of the nature reviewed in *Hogan.* However offensive to us, the real question is whether the activity had an unlawful effect on the suspect.

It is obvious that appeals to the suspect must be directed to his or her sensitive feelings in order to cause the release of truth. In this case there were no improper promises. Instead, the sheriff became involved in a religious discussion and made use of the obvious fact that defendant was likely to experience considerable emotional problems because of her admitted sexual relationship with the victim and the possibility that she killed him. I am prepared to criticize the sheriff for his use of religious persuasion but not

to find its use was so legally impermissible irrespective of its effect on the defendant that her statements must be excluded.

It is sometimes difficult to draw the line between permissible and impermissible police conduct. Several examples illustrate this uncertainty. In *Leuschner* v. *State* (1980) 45 Md.App. 323 [413 A.2d 227], the defendant was convicted of murdering and sexually molesting a nine-year-old boy. To obtain his confession after six unsuccessful interrogations he was taken to the boy's grave and required to view the body. This he contended was psychological coercion. The appellate court responded:

"Because of the western world's ingrained belief in the sanctity of human life, the viewing of a child's cadaver recently exposed in a shallow grave is psychologically more grotesque than a viewing of heroin recently possessed by an accused; but both viewings are purposed to the same end, i.e., to elicit a confession. The viewing procedure itself is not conclusive of involuntariness, [citation]. A victim's remains would no more coerce, compel or improperly induce an innocent person to confess to a murder that he did not commit than a heroin display would coerce, compel or improperly induce an innocent person to confess to owning narcotics that he had not possessed.

". . . The contemporary responsibility of law enforcement officers to use more sophisticated methods of extracting confessions makes our review of the circumstances surrounding a confession more difficult because of the more delicate judgments to be made. . . ." (413 A.2d at p. 242.)

"'Of course, such inquiries have limits. But the limits are not defined merely by calling an interrogation an "inquisition," which adds to the problem only the emotions inherited from medieval experience. The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" (*Id.*, at p. 244.)

Other courts would not agree with the *Leuschner* court. However, in disagreeing the concern would be directed to the particular effect on the suspect rather than the inherent repulsiveness of the procedure. (Annot. (1969) 27 A.L.R.3d 1185, 1186.)

In this case the sheriff was a casual friend of the defendant. However, appeals to friendship, or other trusted relationships, are not impermissible. Charged with murder, a young army soldier was caused to unburden himself by the device of having a police officer pose as a friendly army officer. In *United States* ex rel. *Lathan* v. *Deegan* (2d Cir. 1971) 450 F.2d 181, the court permitted the use of the confession. "Stegman's representations with respect to the Army were not of such a character as to overbear Lathan's will so that he was unable to resist pressure, nor was there the slightest

indication that he was fatigued. Stegman merely set the scene—whether or not Lathan believed he was an army officer—for Lathan to unburden himself. The confession was, in fact, induced by Stegman's demonstration that he had hard evidence linking Lathan to the homicide and not, as alleged, by Stegman's feigned friendliness. It is inconceivable that a person of reasonable intelligence would confess merely to please an acquaintance of one day, which in substance is Lathan's claim." (*Id.,* at p. 185, fn. omitted.)

The *Lathan* court distinguishes the frequently cited *Spano* case, summarizing the facts of that case to show how little it compared to the bogus army officer deceit it was reviewing. The *Spano* case is also cited by our majority because of concern over police tactics which delve into the suspect's psyche to find some area of special vulnerability, a practice which I find only logical, and lawful if kept within acceptable limits. We should note the *Lathan* court's description of the *Spano* facts and reach the same conclusion: "Lathan would have us read Spano v. New York, [1959] 360 U.S. 315 . . . as holding that any confession following police deception is involuntary. The holding in that case is not nearly so broad. In *Spano,* a rookie patrolman who was also a close friend of the defendant stated that his job in the Police Department and the welfare of his pregnant wife and three children would be in jeopardy if Spano did not confess. Moreover, Spano already had been indicted for the crime under investigation when he was denied access to his retained attorney and questioned continuously for eight hours by a battery of some fifteen interrogators. No such factors are presented here." (*Ibid.*)

The single important issue raised on this appeal is whether a sheriff who appeals to moral and spiritual benefits oversteps the boundary of acceptable police conduct. In general he does not.

"The term 'benefit,' when used in connection with the procurement of a confession, means a temporal or worldly benefit. It is the enticement of a temporal benefit only that will affect the voluntary character of a confession made in hope of it, and it is well settled that an exhortation of a moral, religious, or spiritual nature which results in the making of a confession does not render it involuntary. Thus, the fact that a confession was influenced by appeals to superstitious beliefs does not render it inadmissible." (29 Am.Jur.2d, § 560, p. 619.)

Nevertheless, although superficially an appeal to reason, morality, and peace of mind, the sheriff's references to a potential mental breakdown may have had an overriding effect on Nancy Adams' will to resist making damaging admissions. The facts will now be examined with that in mind.

The majority opinion includes the major facts. However, some emphasis is needed if we are to give the People the proper preference on appeal. The

most obvious ultimate fact is that the defendant's profile is not a simple one. Her only physical ailment is longstanding severe asthma. She uses medication and an inhalator to keep relatively well. Her high school education was interrupted in order to marry. She has had two marriages and, not long before the homicide, lost the custody of her daughters to her first husband after the police removed them from her custody due to a report she had abused them. She has been an occasional churchgoer and has religious beliefs of uncertain depth. Although she did not complete the last year of high school, she has been able to be the manager of three small business outlets.

In only two months she entangled herself in a stormy relationship with the recently divorced man whose life she took. She was attracted to him, arranged to meet him, and perhaps unknowingly, shared him physically with a neighbor woman during the same period. She had not yet fully realized the casual way she was being treated. Her letters indicate increasing jealousy, remorse, apology for emotional displays while drinking, and other conduct which a person of moral conscience might find difficult to bear. Yet, she schemed to have him no matter what, saying no one else would have him. She did this fully aware of his affection for his child and desire to return to his former wife. She tricked him into the last drive to a remote spot where he was killed. In the last moments of his life the victim rejected her. Not only was he shot, but he was also run over by the vehicle from which he had fallen. Only the defendant knows whether she purposely drove over his body.

Within minutes, perhaps only seconds, of the killing, witnesses came by and saw the car still moving. Remarkably, defendant called for help and blurted out a complex tale of a highway killing by several unknown assailants. Rather than going into a trance, or exhibiting any mental inhibitions, she became fully involved in seeking help from the police to track down those who had murdered the man she asserted was to marry her the next day. With hindsight, we know she was a moving force in much of what followed.

Defendant was not a helpless, easily pressured victim of sophisticated police interrogation. Nancy Adams used her friendship with the sheriff from the very beginning, perhaps making a fool of him. He came to the scene of the crime, gave her attention and respect, heard her pleas to catch the murderers, and eventually gave her a ride home. All this time she was concealing the murder weapon in her purse. She kept those who wanted to help her from knowing she had the murder weapon, never letting her purse be touched by others. Ironically, the sheriff drove her home with the very same gun it is said must be excluded from evidence because of the sheriff's use of religious persuasion and warnings of the effects of a disturbed conscience.

The majority notes that conflicts in evidence must be resolved in favor of the trial court decision. That certainly is the case when we look to the defendant's mental and physical condition. Although the majority generally observes this rule, too much emphasis is given to the defendant's conflicting evidence regarding her physical and mental condition during the interviews. Ample evidence supports the conclusion she was relatively well and alert. She agreed to and did take a lie detector test, but later challenged the police version by overstating the medication she had taken. However, a cautious technician who gave the test did so only after getting her affirmation that she was all right and not affected by medication, thereby putting to rest her claim that she could not even recall the test.

Therefore, we have a woman who urges the police to energetically pursue every means to solve a crime in which only she can give real help. She is kept advised, questioned from time to time, treated with the courtesy deserving of a fellow church member, is always free to suspend the discussions to get food or drink, and able to go home at will. As the physical facts begin to conflict with her story, she becomes a suspect and each time is given *Miranda* advisements. Between each occasion she goes home, free to discuss the matter with anyone. After arrest and first appearance in court, her only hope is to exclude her admissions and the statement she intended to kill the victim. The judges below who found the statements voluntary beyond a reasonable doubt were fully able to fairly weigh the sheriff's "persuasion" against her will to resist. In his decision Judge Rosson cited the applicable case law.

We should not overlook the fact that the admissions given the sheriff during the discussion of religion and the "sin factor" did not result in what might be expected from a person whose will had been overcome. Defendant realized that she could not hold to certain parts of her "story" and reached for a new one which would satisfy the officers' account of the physical facts and still absolve her. Coincidentally, she did this in the sheriff's presence on his assurance that he would not lose respect for her. But unlike a person seeking a divine pardon, she continued to use the sheriff, juggling the facts to create her new version which was for the most part self-serving. As a part of the new, but still exculpatory version of the events, she had to reveal the location of the gun.

We know the sheriff acquired some useful information from the defendant. More important is the fair inference that in giving the information defendant thought she was conceding nothing which would hurt her. So far as she knew, once again she had convinced her friend the sheriff. Her last step to freedom would be the lie detector test she also expected could be successfully taken.

It is true defendant hoped to make a good appearance. She wanted to regain custody of her daughters which she had lost before these events took

place. Because she thought it was important to be considered a proper and fit mother, she tried her new version of the facts hoping the officers would believe her. Regaining child custody was *her* idea. Even if this were a major motivating factor in her mind, the officers were in no position to offer her help in that respect and did not suggest they could.

I hope that the majority position is not construed as a holding that an interrogator's reference to religion, or the troubled emotions of someone living with an unrevealed crime, voids a confession irrespective of the impact on the suspect. In Justice Traynor's words, assuming the confession is voluntary, "[o]nly overwhelming social policies can justify the exclusion of such vital evidence." (*People* v. *Garner* (1961) 57 Cal.2d 135, 163 [18 Cal.Rptr. 40, 367 P.2d 680] (conc. opn.).)

To the extent that the sheriff obtained any admissions, they were a voluntary part of a new defense to a crime for which defendant was not yet under arrest. All that followed was properly developed through conventional means. The other issues raised in this appeal are without merit. I would affirm the judgment.

A petition for a rehearing was denied July 14, 1983, and respondent's petition for a hearing by the Supreme Court was denied September 8, 1983.