Filed 10/23/13  P. v. Roldan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>ROBERTO ROLDAN,<br><br>     Defendant and Appellant. | G047058<br><br>(Super. Ct. No. 11CF0170)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kelley Johnson and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Roberto Roldan of seven counts of committing lewd and lascivious acts against children under the age of 14 (Pen. Code, § 288, subd. (a); all statutory citations are to the Penal Code unless otherwise noted), and found he committed sexual offenses against four victims (§ 667.61, subd. (b)). Roldan contends his postarrest statements to investigators were involuntary because the interrogation occurred during early morning hours following a lengthy period of confinement, he was handcuffed and seated uncomfortably on a stool during the hour and 45 minute interrogation, and officers invoked religion to obtain his admissions. For the reasons expressed below, we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

In August 2006, Erica R. and her then six-year-old daughter E. moved into a three bedroom house in Santa Ana owned by Erica's sister Edith, and Edith's husband. Erica's brother, 26-year-old defendant Roldan, also resided in the house, as did their sister Virginia, Virginia's son, and a friend. At some point in 2007, Edith and her family, including daughters S., G., and A., moved in as well.

In August 2007, E. told her mother that Roldan had touched her vagina inappropriately. E. also stated Roldan had touched Edith's daughters, G. and A. Erica told Virginia but decided not to tell Edith, fearing that E.'s father, who lived in Las Vegas, would take E. away from her if he learned of the abuse. Erica felt she could be "very careful" and prevent Roldan from touching the girls again.

Around March of 2008, Edith advised Erica that Roldan had abused Edith's daughter S. Erica confronted Roldan, who tearfully admitted he had "played" with the girls, and stated he did not want to go to jail. He moved out of the home. Edith later took S. to a psychologist, who reported the abuse to authorities in April 2009.

2

S. (born in August 1991) testified Roldan first touched her inappropriately when she was seven or eight years old. She was in her sister J.'s bedroom getting ready to go to sleep when Roldan, who had been reclining on the floor, reached up, slipped his hand up her shorts, and touched her vagina. On a later occasion, she awoke from a dream and perceived Roldan reaching toward her, but he did not touch her body. Much later, she disclosed the abuse to a friend, who advised her to tell a high school counselor.

G. (born in April 1997) testified Roldan touched her inappropriately more than once when she was seven or eight years old. He took her to his room to play "doctor." He took off her pants and underwear, made her straddle him, and bounced up and down. He was usually naked. His penis penetrated her vagina, and Roldan ejaculated during these encounters. On other occasions, he stood behind her and touched his penis to her bottom. He also touched her vagina and put his finger in her bottom, touched her chest over her clothes, and on one occasion kissed her on the lips. He made her touch and rub his penis. He warned her not to tell anyone. She was afraid and did not disclose the abuse until E. told Erica.

A. (born in September 1999) testified Roldan touched her "in a way [she] felt was wrong." She told a child abuse services team (CAST) interviewer in January 2011 that Roldan sexually abused her, G., and E., in a room by the kitchen. He would take them from "any place we were hiding." Roldan kissed A. on her neck, mouth, and cheek. He also took her clothes off, stood behind her, and put his penis in her bottom. He put A. "to his bed" "like he wanted to have sex" and "put his [penis] on" her bottom. He touched her shoulders and thigh. The activity would happen "[e]very day" and "all the time," but at least "four times." A. attempted to push him away and kick him, but he "would still get me." The abuse occurred between the time she was in preschool and first

3

grade and the last incident occurred "a few weeks or days" before Roldan moved out of the house. No abuse occurred after they told Erica.

E. (born in March 2000 testified Roldan touched her in a "bad" way. She told the CAST interviewer in January 2011 that Roldan first "rape[d]" her when she was five or six years old. The abuse occurred in his bedroom on one of two couches used as beds. He locked the door with a key, took off E.'s clothes and kissed her on her nipples, neck, stomach, and vagina with an open mouth. He also touched and rubbed her vagina, and touched her "behind or butt." He tried to insert his penis into her vagina and her behind, but she prevented this by kicking him. She saw "sperm" come out. He tried to have her kiss his penis, but she refused. E. estimated Roldan abused her five to 10 times. The last incident occurred about four weeks before he moved out. E. initially did not disclose the abuse because she thought her mother "would hate" her, but finally told her when she was eight or nine years old. The abuse stopped because her mother never left her alone with Roldan.

Santa Ana Detective Eva Lopez and Officer Ricardo Perez interviewed Roldan at the police station in the early morning hours of January 15, 2011. The prosecutor played a DVD of the interview at trial. After initially stating he "didn't do anything" with his nieces, he ultimately apologized and admitted "abusing them" by touching and rubbing their private areas with his penis.

Following trial in April 2012, the jury convicted Roldan as noted above. In May 2012, the court sentenced Roldan to 60 years to life in prison, comprised of four consecutive terms of 15 years to life, one for each victim, and concurrent life terms for the remaining three counts.

4

## II

### DISCUSSION

*Roldan's Postarrest Statements to Police Investigators Were Voluntary*

On October 8, 2010, the police obtained an arrest warrant for Roldan. At approximately 9:30 p.m., on Wednesday, January 12, 2011, a CHP officer stopped Roldan for a traffic violation and arrested him on the warrant. The officer booked Roldan into the Orange County jail.

The superior court maintains a courtroom at the jail (CJ1) to conduct arraignments and other duties between 10:00 a.m. and 7:00 p.m. The cutoff time to file a criminal complaint is 12:00 noon. Roldan was taken to the CJ1 holding cell sometime on January 14, but did not appear before a magistrate. Around 11:15 p.m. that night, Detective Lopez received a message from the jail informing her Roldan had been arrested on the warrant. Santa Ana police and the prosecutor's office did not know Roldan had been arrested until this point. About 75 minutes later, Lopez contacted the jail and learned Roldan soon would be released. At 12:45 a.m., deputies released Roldan from jail, but Lopez and Perez immediately arrested him as he attempted to leave the building. Lopez and Perez began interviewing Roldan at the police station approximately 35 minutes later. The interrogation lasted approximately one hour and 45 minutes.

Before trial, Roldan moved to suppress the statements alleging his statements were involuntary. The court denied the motion without comment.

Roldan contends his statements were involuntary because the interrogation occurred during early morning hours following a lengthy period of confinement and after a momentary release from custody, he was handcuffed and seated uncomfortably on a stool for the hour and 45 minute interrogation, and officers invoked religion to coerce his

5

admissions.  Our review of the record, however, supports the trial court's conclusion Roldan's admissions were voluntary.

A confession is considered voluntary if it is the "'product of a rational intellect and a free will.'" (*People v. Holt* (1997) 15 Cal.4th 619, 663.)  Conversely, an involuntary confession occurs under the Fourteenth Amendment's due process clause if the "'defendant's choice to confess was not "essentially free" because his will was overborne.'" (*People v. Massie* (1998) 19 Cal.4th 550, 576.)  In determining the voluntariness of a confession, a court must consider "'the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.'" (*People v. Memro* (1995) 11 Cal.4th 786, 827.)  "'Among the factors to be considered are "'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'"'" (*People v. Boyette* (2002) 29 Cal.4th 381, 411.)  On appellate review, "'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported.  [Citations.]  However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033; *People v. Haley* (2004) 34 Cal.4th 283, 298.)

We have reviewed the DVD of the interview and considered the totality of the circumstances.  There was no evidence Roldan, 30 years old at the time of questioning, lacked the ability to act freely.  Nothing apart from the sexual abuse suggests he lacked maturity or had mental health issues that allowed him to be easily coerced.

6

Before the interview began, Lopez advised Roldan of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, and Roldan responded he understood his rights. He did not ask for a lawyer or invoke his right to silence.

The length of pre-interrogation detention here is a factor weighing against voluntariness. But there was no evidence Roldan was mistreated during his incarceration. (Cf. *People v. Neal* (2003) 31 Cal.4th 63, 74, 82 [police denied the defendant food and drink and ignored his requests for counsel and invocations of right to silence].) The defense stipulated Roldan was not deprived of sleep or meals during the two days he spent in jail and he was treated like every other inmate.

Roldan complains he remained handcuffed and "placed sitting on a stool with no back support in the corner of the room," the officers "positioned their chairs surrounding" him, "and then with each denial . . . they moved their chairs closer to him . . . ."[1] He also cites the time of day and length of the interrogation, and suggests the presence of two officers, especially Officer Perez, further intimidated Roldan.

Although Roldan's description is substantially accurate, the officers conducted the interview in a calm and conversational tone. Roldan appeared to be seated

---

[1] The Attorney General argues Roldan forfeited (*People v. Williams* (2010) 49 Cal.4th 405, 435) the voluntariness argument because his complaint in the superior court was that "the environment surrounding [the] confession was one of custody, a brief sense of relief upon release from custody, and an immediate return to custody." The Attorney General asserts Roldan's complaints about handcuffs and the detectives' movements during the interrogation involve factual matters that should have been raised below and "in particular illustrates the reason to apply the rule of forfeiture."

Roldan's written motion noted the interview was recorded, a transcript was attached to the motion, and counsel stated he would provide the CD/DVD of the interview at the hearing on the motion. The court's minutes do not show the court received the DVD into evidence for the motion, but the DVD was played for the jury at trial. Because Roldan moved to suppress his statements as involuntary and the court played the DVD for the jury, and voluntariness is a legal question subject to our independent review, we elect to address Roldan's claims on the merits.

comfortably, did not appear fatigued, and did not complain of discomfort. Officers did not withhold anything during the interrogation. Although Roldan became emotional and cried during the interview, there was no evidence of mistreatment. Nor was the interview particularly lengthy. (*People v. Alfieri* (1979) 95 Cal.App.3d 533, 545 [20-hour interrogation without counsel was coercive].)

Roldan also objects to Lopez's invocation of religion during the interview. At one point, Lopez told Roldan, who had admitted touching S.'s leg on two occasions, but denied touching her vagina, that he was "not being completely honest . . . , I know that, you know that and [Officer Perez] knows that and God knows that. And [S.] knows that." Lopez later stated she knew Roldan was embarrassed but she was "not here to judge" him and that "[t]he only one who's going to judge is God, okay? That's who you need to worry about, not me."

Roldan relies on *People v. Adams* (1983) 143 Cal.App.3d 970 (*Adams*), disapproved on other grounds in *People v. Hill* (1992) 3 Cal.4th 959, 995, footnote 3. There, the police interviewed the defendant several times concerning her claim that several unidentified assailants murdered her boyfriend. The sheriff, who knew her from church and her employment at a Christian bookstore, spoke with her alone and told her he did not believe her story based on the physical evidence and her behavior. He reassured her he would not judge her or think of her as un-Christian and explained to her "there was accountability attached to her actions, that appellant knew this as a Christian, and should she continue to deny accountability for what he believed she had done, she would continue to have problems in experiencing more guilt." (*Adams* at p. 979.) He quoted Bible verses teaching "'God is a merciful God'" (*ibid.*), but disregarding God's rules would cause God to turn his back on that individual, who would suffer some form of

8

retribution. The defendant indicated her story might not be true, but stated she did not want to spend the rest of her life in jail. The sheriff responded only a judge could determine the sentence but explained some people received sentences of only "'four to seven years'" (*id.* at p. 981) for killing another person. The defendant admitted she had been lying and directed officers to the murder weapon. *Adams* agreed the cumulative effect of the sheriff's reliance on his friendship with the defendant, his knowledge and use of her religious beliefs, and his suggestion she might end up in a mental institution if she did not tell the truth rendered her admissions involuntary. (*Id.* at pp. 983, 986, 989 ["Religious beliefs are not matters to be used by governmental authorities to manipulate a suspect to say things he or she otherwise would not say"].)

Here, there was no evidence Roldan was particularly susceptible to religious influences, and Lopez's fleeting religious references were far less pervasive than those in *Adams*. Unlike the sheriff in *Adams*, Lopez did not suggest Roldan's failure to confess would result in a mental health commitment, nor did she suggest he would receive a leniently short sentence. Lopez's remarks did not exploit any religious vulnerability, but rather "sought to evoke defendant's better nature by persuading" him that telling the truth was the morally correct thing to do and would provide psychological relief. (*People v. Carrington* (2009) 47 Cal.4th 145, 176 [detective's statement "'[T]here's someone up above, bigger than both us looking down saying Celeste, you know that you shot that person . . . and it's time to purge it all'" was not calculated to exploit religious beliefs].)

Lopez sympathized with Roldan, stating he was a "young kid" when the incidents occurred, he made mistakes, and it was okay to make mistakes. It was "not the end of the world." When he denied abusing the children, she told him she thought he was

lying, and that it was important for him to do the right thing. She explained he would feel better after telling the truth, and his victims would be grateful because apologizing and taking responsibility would enable them to move on. There was nothing impermissible about Lopez's comments. (*People v. Hill* (1967) 66 Cal.2d 536, 549 [nothing improper where benefit mentioned by the police is merely that which flows naturally from a truthful and honest course of conduct].) Moreover, Roldan resisted whatever subtle psychological pressure the officers employed in appealing to his feelings about his family and seeking forgiveness because he continued to deny engaging in certain conduct, such as ejaculation, oral copulation, and touching S.'s vagina, despite repeated questioning on these topics by both officers. This suggests his will was not overborne. We have reviewed the record and are persuaded Roldan's statements were voluntary.

III

DISPOSITION

The judgment is affirmed.

ARONSON, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.

10