Filed 8/4/21  P. v. Maddox CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  LEMONTA MARKUIS MADDOX,  Defendant and Appellant. | D076407  (San Bernardino Super. Ct. No. FSB1200889) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Katrina West, Judge.  Affirmed.

Sheila Quinlan, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistance Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General for Plaintiff and Respondent.

As part of an ongoing gang "war" between Bloods and Crips, 18-year old Lemonta Markuis Maddox shot and killed Anthony M. A jury convicted him of second degree murder as a lesser included offense of first degree murder and made true findings on gun and gang enhancements.

In a video recorded police interrogation played for the jury, Maddox initially denied any involvement. But after about 20 minutes of questioning he confessed to the shooting, claiming self-defense. On appeal, Maddox contends the judgment should be reversed because his confession was coerced by threats of a life sentence and promises of leniency for confessing.

We have watched the video and are unpersuaded by Maddox's claims. The interrogation was not prolonged, the detective did not speak in an aggressive or intimidating manner, and there were no threats, promises of leniency, or any other improper psychological ploy.

The court sentenced Maddox to prison for 40 years to life, making him eligible for a youth offender parole hearing during his 25th year of incarceration. (Pen. Code,[1] § 3051, subd. (b)(3).) In *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), the Supreme Court held that a juvenile offender who receives an indeterminate life sentence must be given adequate opportunity at sentencing to make a record of mitigating evidence tied to his youth. Here, because defense counsel did not request a *Franklin* proceeding, Maddox contends we should remand so he can create an evidentiary record for that future hearing.

---

[1] Undesignated statutory references are to the Penal Code.

We conclude Maddox has forfeited the issue because he was sentenced three years after *Franklin* was decided and trial counsel did not ask for a *Franklin* proceeding. (See *People v. Medrano* (2019) 40 Cal.App.5th 961, 968, fn. 9 (*Medrano*).) Nevertheless, the Attorney General concedes—and we agree—that Maddox may file a motion in the trial court to conduct a *Franklin* proceeding. (*Medrano*, at p. 968.) Accordingly, we affirm the judgment without prejudice to Maddox filing a motion in the trial court for a *Franklin* proceeding should he choose to do so.

FACTUAL AND PROCEDURAL BACKGROUND

The California Gardens Crips is a criminal street gang with about 120 members operating in San Bernardino County. Little Zions is a Blood gang operating in close proximity. It has about 50 members. In 2012, a long history of Crips/Bloods conflict boiled over into a "gang war" between California Gardens and Little Zions. Rival gang members engaged in assaults, drive-by shootings, and even murder.

This case involves self-admitted California Gardens member Lavelle Miller and two associates, Taron Anderson and Maddox. In 2012, Miller attended Arroyo Valley High School. Anderson, who also attended Arroyo Valley, was not a gang member but associated with the gang.[2] Maddox stopped attending Arroyo Valley in 2010, but was frequently on or near school grounds. Although he was not a gang member, he associated with Miller and Anderson.

---

[2] His father, Taron Anderson, Sr., is a California Gardens member.

3

The victim, Anthony M., was a Little Zions gang member. Shortly after high school let out for the day on February 27, 2012, he was fatally shot in the back of the head while fleeing from a group of teenagers near Arroyo Valley.

An Arroyo Valley student, R.O., witnessed the shooting. R.O. knew Anderson from school. He told Detective Marco Granado that he saw Anderson and another African-American male, who was wearing a black and gray sweater with squares on it. The two teenagers were standing so close to each other when shots were fired that he could not determine which was the shooter. After hearing several gunshots, R.O. saw the two teenagers run away. The one wearing the distinctive sweater dropped something, quickly picked it up, and continued running.

From a photograph lineup, R.O. identified Miller as being part of the group of teenagers running away when shots rang out. At about 7:00 p.m. the same day, police arrived at Miller's home for further investigation. Miller was not there, but when police went looking for him in his bedroom they saw gang-related graffiti, including "LZK"—which stands for "Little Zions Killer." Roughly an hour later, police came back to Miller's home after receiving a tip he had returned. They found a 9-millimeter semi-automatic gun hidden underneath Miller's dresser. The gun had been reported stolen about a month earlier.[3]

In response to Detective Granado's questioning, Miller said that Maddox was the shooter. Miller offered to take a lie detector test, and he led

---

[3]     Later, police determined that nine shell casings found at the murder scene were fired from that gun.

Granado to Maddox's home.[4]  At about 10:45 p.m., Granado interviewed Anderson, who admitted being with Miller and Maddox during the shooting. Anderson also told Granado that Maddox was the shooter.  A little more than an hour later, police arrested Maddox at his home, where they also found a sweater with black and gray squares matching R.O.'s description of the clothing worn by one of the teenagers.

Granado began interrogating Maddox at approximately 1:10 a.m. (February 28) at the police station.  After being *Mirandized*,[5] Maddox initially claimed to have "no idea" why he was arrested.[6]  He denied associating with any gangs and maintained he was unaware of any shooting because he had been home all day.  Granado told him, "[W]e've been working this shooting since it happened" and "I've had several people tell me that you were there."  He added, "The people that you were with today identified you."

From that point, Maddox's story quickly unraveled.  Although insisting just a few minutes earlier that he had been home all day, he now said he had walked to a dairy near the high school, where he happened to see Miller and Anderson.  Next, Maddox conceded hearing gunshots and running away.  But he insisted, "[I]t wasn't me like shootin' or nothin' like that."

About 15 minutes later, Maddox admitted that he shot and killed Anthony.  He said, "this guy, I guess he's from Little [Zions]" "was reaching for something . . . ."  According to Maddox, Anderson quickly handed him a

---

[4]     At trial, Miller's story changed.  He claimed he shot Anthony, and he and Maddox agreed that Maddox would take "street credit" for the killing so that he could "crime in" to gang membership.

[5]     *People v. Miranda* (1966) 384 U.S. 436.

[6]     Maddox does not contend the *Miranda* advisement was deficient, nor does he claim that he did not validly waive those rights.

gun, which he fired in self-defense, believing Anthony was reaching for a firearm.

When Granado pointed out that Anthony was shot in the back of the head while running away, Maddox admitted he was "not really" a threat at that point, but explained he shot anyway because he "grew up learning" that "if you do pull a gun out, you gotta gun then shoot it" or else the person will "just come back after you."[7]

DISCUSSION

A. *The Court Correctly Determined that Maddox's Confession Was Voluntary*

1. *General Legal Principles*

An involuntary confession is not admissible evidence. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).) "The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.'" (*People v. Maury* (2003) 30 Cal.4th 342, 404, quoting *Lynumn v. Illinois* (1963) 372 U.S. 528, 534.) A confession is involuntary if "' "extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence."'" (*Linton*, at p. 1176.) In determining the voluntariness of a confession, relevant factors include "' " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'"' [Citation.] No single factor is dispositive." (*People v. Winbush* (2017) 2 Cal.5th 402, 452.)

---

[7] Maddox was tried with Miller and Anderson, who were juveniles at the time. In a separate appeal, this court affirmed their convictions for second degree murder. (*People v. Anderson* et al. (Apr. 8, 2020, D076201) [nonpub. opn.].)

6

" 'On appeal, we conduct an independent review of the trial court's legal determination' as to the voluntariness of a confession.  [Citation.]  Although we rely on the trial court's factual findings to the extent they are supported by substantial evidence, where, as here, "[t]he facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded," those facts as well as the ultimate legal question are 'subject to our independent review.' "  (*People v. Wall* (2017) 3 Cal.5th 1048, 1066 (*Wall*).)

2.  *Additional Procedural History*

Before trial, Maddox moved to suppress his confession, claiming it was involuntary—the result of Granado's "improper conduct."  The court denied the motion in a 17-page ruling containing these findings:  (1) Maddox was in the police interview room for about 80 minutes, but was questioned only by Detective Granado, and for just 21 minutes before confessing; (2)  Granado "maintained a calm professional manner and tone throughout the interview.  No other officer was present during the interrogation"; (3) Maddox had recently turned 18, had experience with the criminal justice system and his maturity was "appropriate for his age"; (4) He "did not display any physical or mental disabilities"; (5) Although near the end of the interrogation Maddox said he was depressed because of the recent miscarriage of his unborn child, before the interview began, when Detective Granado inquired, " 'How you doin?' " Maddox responded, " 'Good' "; (6) Maddox did not display any "commonly recognized signs of depression or behave in a distraught or emotional manner.  He appeared calm during the entire interview, even during his [c]onfession and afterward when discussing the loss of his unborn child"; and (7) He "did not ask for food, something to drink, to use the restroom or for a break, prior to making the [c]onfession."

3. *There Was No Improper Threat, Nor Any Implied Promise of Leniency*

Maddox contends his confession was involuntary because police threatened he could spend life in prison for murder, but would receive leniency if he confessed. He further claims that Granado "increased the pressure" by stating this opportunity "was fleeting" and his "last chance at freedom." In making this argument, he relies on the following colloquy:

"[Granado]: Do you want to go to jail for this?

"[Maddox]: No, Heck no.

"[Granado]: What kind of case is this right now? Do you know what kind of case this is right now?

"[Maddox]: Yeah I do.

"[Granado]: What is it.

"[Maddox]: It's a murder case.

"[Granado]: Murder case. What happens to people when they go to jail for murder?

"[Maddox]: They do life.

"[Granado]: Is that what you're willin' to do right now?

"[Maddox]: Heck no. I ain't trying to do that.

"[Granado]: Then you need to speak to me. Because as it sits right now, the evidence mount [*sic*] against you that's a, that's a rap. That's a murder rap right there. [¶] Then you need to tell me, you're that missing piece of the puzzle[.] [T]hen you need to tell me what happened.

"[Maddox]: I'm tellin' you I don't know who shot 'em.

"[Granado]: Why'd you do it?

"[Maddox]: I didn't do it sir." [¶] . . . [¶]

"[Granado]: You really want to go to jail for the rest of your life over this thing[?]

"[Maddox]: I really don't.

8

"[Granado]:  Are you willing to do that right now?

"[Maddox]:  No 'cause I got a good life ahead of me.

"Granado: [O]kay.  This might be your last chance at freedom, unless you tell me what happened.

"[Maddox]:  I'm telling you sir.

"[Granado]:  You're not telling me anything that's helping me out, helping you out right now.  All you do is tell me a bunch of lies.

"[Maddox]:  But I ain't gonna snitch on somebody[—]

"[Granado]: Well you can't walk out this door[—]

"[Maddox]:  not knowin' what happened.

"[Granado]:  knowing that there's a lot of lies that you're telling me.  We got to know the truth before we, we get out of here.  And once I get outta here and I tell them to book you to jail, that's it for you dude.

"[Maddox]:  I ain't goin to say somethin' when I don't know what happened.

"[Granado]:  Well you need to think real hard about that because if you were out there and it wasn't you, then you know who did it.

"[Maddox]:  I'll [*sic*] I know.

"[Granado]:  And for you to sit here and be quiet, doesn't make any sense to me.  People, people tell the truth all the time and they always benefit from it.  Do you know what that means?

"[Maddox]:  No.

"[Granado]:  Something usually good happens to somethin' when they come up and finally tell the truth.

"[Maddox]:  Yeah."

"[Granado]:  They clear their souls."  [¶] . . . [¶]

9

"[Granado]: [O]kay. That's why it's always nice to tell, to be, to be truthful. I'm giving you that opportunity right now before I walk out of here and just say forget it [a]bout it, [a]bout you the rest of your life." [¶] . . . [¶] "How do you think we got your name?

"[Maddox]: I don't know.

"[Granado]: We've been doing our homework tonight. Like I said, we've been working this thing for ten hours man and so we're giving you an opportunity to tell us what happened or else guess what? That's it for you. I'm just going to get out of here and you're going to have to fight this battle by yourself[.] I can't help you. But if you help yourself out, I'll help you. Once I walk out of here man, it's, it's done 'til you go to court and you better hope that the judge and jury you know, believe you and if I'm not believing you right now, they're not going to believe you and that's what, that's it for you man. The rest of your life."

It is true, of course, that a confession resulting from threats coupled with express or even implied promises of leniency for confessing is involuntary. The Supreme Court has explained:

" 'Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . . [The police] are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).)

Nevertheless, Maddox's argument fails because Granado did not threaten him. Miller and Anderson had already said that Maddox shot Anthony. Informing Maddox that he was facing a life sentence for murder was no threat—it was a fact. Confronting a suspect with incriminating evidence is not a coercive interrogation technique. (*Holloway, supra*, 33 Cal.4th at p. 115.)[8]

Moreover, a confession is involuntary only if the coercive police conduct is "causally related" to a later confession. (*People v. Williams* (2010) 49 Cal.4th 405, 437.) It must be a "motivating cause of the decision to confess." (*Wall, supra*, 3 Cal.5th at p. 1066.) Here, after acknowledging that murder carries a life term, Maddox still maintained his innocence, stating, "I didn't do it," "I ain't no killer," and "I didn't shoot him." Therefore, even if construed as a threat, talk about a possible life sentence was not a motivating cause of Maddox's admissions.

In a related argument, Maddox asserts that Granado promised leniency in exchange for a confession. He points to Granado's statements that people who tell the truth "always benefit" and if he admitted being the shooter, Granado would "help" him. Relying heavily on *People v. Flores* (1983) 144 Cal.App.3d 459 (*Flores*), Maddox contends that "[j]ust as the police did in *Flores*, Granado suggested a worst-case scenario could be avoided if [Maddox] spoke to police" and admitted being the shooter.

There are two fundamental errors in Maddox's argument. First, all Granado did was exhort Maddox to be truthful. He described moral or psychological advantages of telling the truth ("Something usually good

---

8    In any event, a life sentence for murder was not news to Maddox. When Granado said, "What happens to people when they go to jail for murder," Maddox correctly answered, "They do life."

11

happens . . . when they come up and finally tell the truth. [¶] . . . [¶] They clear their souls."). And the law is clear that " 'mere advice or exhortation by police that it would be better for the accused to tell the truth' " does not render a subsequent confession involuntary. (*Holloway*, *supra*, 33 Cal.4th at p. 115; see also *People v. Carrington* (2009) 47 Cal.4th 145, 172 (*Carrington*) ["[W]hen law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of authorities arises."].)

"Moreover, 'there is nothing improper in pointing out that a jury probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials.' " (*People v. Case* (2018) 5 Cal.5th 1, 26.) Nor was it coercive for Granado to say, "We got to know the truth before we, we get out of here." (See *Linton*, *supra*, 56 Cal.4th at p. 1178 ["There was nothing coercive in the officers urging defendant to tell the truth and informing defendant of the obvious point that the sooner he told the truth, the sooner the interview would finish."].)

Second, Granado made no specific promise of leniency or favorable treatment. He said, "But if you help yourself out, I'll help you." This nebulous offer of some type of "help" falls well short of a promise of lenient treatment. Granado did not represent that he, the prosecutor, or the court would grant any particular benefit if Maddox confessed. Nor did Granado offer to intercede on Maddox's behalf with the prosecutor or the court. Accordingly, Granado's unspecific offer to "help" could not have been coercive. (See *Carrington*, *supra*, 47 Cal.4th at p. 174 [interrogators' statements "did not constitute a promise of leniency" when "[t]he interviewing officers did not suggest they could influence the decisions of the district attorney, but simply

12

informed defendant that full cooperation might be beneficial in an unspecified way"].)

Maddox's reliance on *Flores* is also inapt. There, police interrogating a suspect in a robbery/murder investigation said he " 'could go to the . . . gas chamber' " and then "immediately" told the accused, " 'Maybe that's not so, you know, but you're the only one that knows that.' " (*Flores*, *supra*, 144 Cal.App.3d at pp. 466, 471, italics omitted in first quote.) By telling the accused that only he could help himself "out of this mess," the police indicated that "[o]nly by confessing his involvement in the decedent's death could the appellant avoid the possible death penalty." (*Ibid*.) Then, exacerbating the situation, police implied that if the accused gave a story supporting self-defense, he might be released on his own recognizance until trial. (*Id*. at pp. 471–472.)

In contrast here, Granado said nothing to suggest that anything Maddox might say could result in his release from custody. To the contrary, it was a foregone conclusion from the very outset that Maddox was going to jail on a murder charge. There was already a mountain of evidence against him. An independent witness had placed him at the location from which the shots were fired; his cohorts told police he was the shooter; and police already had the murder weapon. Before Granado asked his first question, police had already taken booking photographs, required Maddox to strip down to his boxer shorts, confiscated his clothes, and had him don a paper gown. Police did not need a confession to charge Maddox with murder. Rather, Granado needed to know if there was evidence to the contrary. He quite appropriately said to Maddox, "Then you need to tell me, you're that missing piece of the puzzle[.] [T]hen you need to tell me what happened."

13

4. *There Was No Improper Appeal to God or Religion*

About midway through the 20 minute interrogation, Granado asked Maddox if he attended church, and this colloquy followed:

> "[Granado]: You go to church?
>
> "[Maddox]: Yeah I go to church.
>
> "[Granado]: Okay. Ain't it nice to be making, to make things right with God?
>
> "[Maddox]: Yeah[.]
>
> "[Granado]: That's another, that's another reason why people tell the truth.
>
> "[Maddox]: Yeah.

The only other reference to spirituality was a fleeting reference to prayer, which occurred immediately before Maddox said that he shot in self-defense:

> "[Granado]: [Y]ou know you're lying.
>
> "[Maddox]: I didn't shoot him.
>
> "[Granado]: You know you did. You need to make things right. We need to talk about it in here or speak on it or you want to speak on it when you say your prayers tonight, whatever the case me [*sic*] be you're [unintelligible] is gonna come out."

In the trial court, defense counsel asserted the confession was coerced because Granado "play[ed] the God card" and "[t]he God concept caused him to give that confession." The trial court rejected the argument , and assuming for the sake of discussion that the issue has not been forfeited, we do as well.[9]

---

9    The argument section of Maddox's opening brief spends considerable time referring to the discussion about God and religion, but only in the factual and procedural background section. Although we could deem the issue to have been forfeited because it was not specifically argued, we

14

A confession obtained by "exploiting a suspect's religious anxieties" is involuntary and thus inadmissible. (*People v. Kelly* (1990) 51 Cal.3d 931, 953 (*Kelly*).) Thus, in *People v. Adams* (1983) 143 Cal.App.3d 970 (*Adams*), a confession was suppressed where the interrogating officer attended the same church as defendant and made repeated references to the defendant's sin, guilt, apostasy, and " 'reprobate mind.' " (*Id.* at pp. 987–990.)[10]

But discussing religion with a suspect is not, in and of itself, an impermissible coercive interrogation technique. (*Kelly*, *supra*, 51 Cal.3d at pp. 951–953 [questions about belief in Jesus, going to heaven, Christian upbringing, and violating Christian values did not render confession involuntary].) For example, in *Carrington*, during an interrogation a detective stated, " '[T]here's someone up above, bigger than both of us looking down saying Celeste, you know that you shot that person in San Carlos and it's time to purge it all.' " (*Carrington*, *supra*, 47 Cal.4th at p. 176.) The Supreme Court held this was not an impermissible appeal to religious beliefs, but rather an effort to awaken the defendant's "sense of guilt" and "evoke defendant's better nature by persuading her that 'purg[ing] it all' was morally the right thing to do and would provide her with psychological relief." (*Ibid*.) In drawing the line between permissible and coercive references to God or religion, the Supreme Court has stated: "When police comments are not 'calculated to exploit a particular psychological vulnerability of [the] defendant,' however, and 'no acute religious anxiety or sense of guilt was

---

exercise our discretion to address it since the operative facts are undisputed (shown on the video, exhibit 197) and it presents a question of law.

10    *Adams* was disapproved on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13.

apparent from prior questioning,' appeals to religion are unlikely to be a motivating cause of a defendant's subsequent confession." (*Ibid.*)

Here, Granado's references to God, church, and prayer were not coercive. He simply implored Maddox to do what was morally correct and make things "right with God" by telling the truth. Nothing indicates that Maddox was devoutly religious or had any psychological vulnerability to appeals to religion that might overcome his will.

*Adams*, *supra*, 143 Cal.App.3d 970 is instructive by way of comparison. There, the police interviewed the defendant several times concerning her claim that unidentified assailants murdered her boyfriend. The sheriff, who knew her from church and her employment at a Christian bookstore, then spoke with her alone and told her he did not believe her story based on the physical evidence and her behavior. He explained to her "there was accountability attached to her actions, that [the defendant] knew this as a Christian, and should she continue to deny accountability for what he believed she had done, she would continue to have problems in experiencing more guilt." (*Id.* at p. 979.) The sheriff quoted Bible verses indicating " 'God is a merciful God' " (*ibid.*), but disregarding God's rules would cause God to turn his back on that individual, who would suffer some form of retribution. (*Id.* at p. 980.) He suggested that if the defendant continued to deny culpability, she was "capable of experiencing the moral isolation and abandonment" described in the Bible. (*Ibid.*) The sheriff referred to a book written by a minister which included a description of a young woman in a mental institution suffering from a " 'sin factor' " arising from guilt. He told the defendant he believed her situation was similar, suggesting she could end up in a mental institution. (*Ibid.*)

The *Adams* court held that the cumulative effect of the sheriff's reliance on his friendship with the defendant, his knowledge and use of her religious beliefs, and his suggestion she might end up in a mental institution if she did not tell the truth rendered her admissions involuntary. (*Adams, supra,* 143 Cal.App.3d at pp. 983, 986, 989.) *Adams* noted "the totality was not purely intellectual persuasion, but an overwhelming and calculated appeal to the emotions and beliefs, focusing [the defendant's] fears in an area the sheriff knew [the defendant] to be particularly vulnerable." (*Id.* at p. 986.)

Unlike *Adams*, here there is no evidence that Granado knew Maddox to be particularly vulnerable, nor did Granado use religion to manipulate him into making a coerced confession. The detective's brief religious references were not pervasive, nor did Granado quote Bible verses indicating God would punish Maddox's continued denials of culpability. Granado did not speak about God's law, sin, guilt or a " 'reprobate mind.' " (*Adams, supra,* 143 Cal.App.3d at pp. 979–980 & fn. 8.) Further, Granado did not assume the role of a priest or a spiritual advisor, but simply sought information while speaking in a quiet tone and without lecturing about God.

5. *No Coercion in Suggesting Less Culpable Explanation*

After Maddox's repeated denials, Granado asked, "What'd the kid do?" "Did he reach for a gun, was he gonna try, try to shoot you?" A few seconds later, the detective said Maddox was "probably a nice guy," and suggested "something happened today that got you upset. We all get upset and do things we regret." Maddox contends that by attempting to "minimize [his] moral culpability for shooting" and suggesting that he would obtain a better outcome if he admitted acting in self-defense, Granado coerced his confession.

This argument too is untenable. Police may suggest "possible explanations of the events and offer[ ] defendant an opportunity to provide the details of the crime." (*Carrington*, *supra*, 47 Cal.4th at p. 171; see also *People v. Spencer* (2018) 5 Cal.5th 642, 675 [collecting cases and stating " 'the suggestions made by the interrogating officers that defendant may not have been the actual killer, or may not have intended that the victim die' were a permissible interrogation tactic"].) Granado truthfully told Maddox that his friends (Miller and Anderson) had identified him as the shooter, others had told police he was there, his denials were not credible, and the interrogation was his opportunity to tell his version of what happened. It was the strength of the evidence against him, and not any impermissible police coercion that caused Maddox to admit shooting Anthony.[11]

B. *Maddox May Move for a* Franklin *Proceeding in the Trial Court*

Maddox was 18 when he murdered Anthony, and he received an indeterminate sentence of 40 years to life. He will be entitled to a youth offender parole hearing during his 25th year of incarceration. (§ 3051, subd. (b)(3).) At that hearing, the Board of Parole Hearings "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner . . . ." (§ 4801, subd. (c).) In *Franklin*, *supra*, 63 Cal.4th 261, the court held that when a juvenile offender receives an indeterminate life sentence, the offender must be given "adequate opportunity at sentencing to make a record of mitigating evidence tied to his youth." (*Id.* at p. 269.)

---

[11]    Because of this disposition, it is unnecessary to consider whether allowing the confession into evidence was prejudicial.

18

Maddox asserts that although he was sentenced three years after *Franklin*, trial counsel did not "assemble statements from family, friends, school personnel, and community leaders or seek a psychiatric evaluation for use at [a] future youth offender parole hearing." With heavy reliance on *People v. Carranza* (2019) 40 Cal.App.5th 673 (*Carranza*), he contends we should remand his case under *Franklin* so that he can generate a record for his eventual youth offender parole hearing.

The Attorney General, citing *Medrano*, *supra*, 40 Cal.App.5th at page 968, contends that Maddox's failure to request a *Franklin* proceeding at sentencing forfeited his current claim. He further concedes, however, that despite this forfeiture Maddox may file a motion with the trial court under section 1203.01 "to place information contemplated in *Franklin* on the record" as authorized by *In re Cook* (2019) 7 Cal.5th 439, 458 (*Cook*) ["for inmates . . . who seek to preserve evidence following a final judgment, the proper avenue is to file a motion in superior court under the original caption and case number, citing the authority of section 1203.01 and today's decision"].

We agree with the Attorney General on this issue. In *Cook*, the Supreme Court made clear that a *Franklin* proceeding may be waived, noting that "[d]elving into the past is not always beneficial to a defendant. The opportunity for a *Franklin* hearing is just that: an opportunity." (*Cook*, *supra*, 7 Cal.5th at p. 459.) If a defendant may intentionally forego a *Franklin* proceeding by not asking for one in the trial court, he may likewise forfeit the issue on appeal in a similar fashion. The "same forfeiture rules that apply to countless other rights in criminal proceedings" apply in this context too. (*Medrano*, *supra*, 40 Cal.App.5th at p. 968, fn. 9.)

Here, Maddox's sentencing in 2019 occurred three years after *Franklin* was decided. Because nothing in the record indicates that he lacked an adequate opportunity at sentencing to make a record of mitigating youth-related evidence, there is "no basis" for ordering a limited remand for that purpose. (*Medrano, supra*, 40 Cal.App.5th at p. 963.) But this does not mean Maddox has no remedy. If he so chooses, he may seek a *Franklin* proceeding by filing an appropriate motion in the trial court. (*Cook, supra*, 7 Cal.4th at p. 458.)[12]

Maddox's argument that we should remand to require the trial court to conduct a *Franklin* proceeding is untenable. The published opinion he primarily relies on, *Carranza, supra*, 40 Cal.App.5th 673, is not citable.[13] Maddox's brief fails to note that about two weeks after *Medrano* was decided, the court in *Carranza* granted rehearing, thus vacating its prior opinion and "eliminating the rule of law" upon which he relies.[14] (See *Morgan v. Stubblefield* (1972) 6 Cal.3d 606, 624.)

---

[12] This disposition makes it unnecessary to consider Maddox's claim that trial counsel rendered constitutionally ineffective assistance by failing to request a *Franklin* proceeding at sentencing.

[13] Maddox's reliance on *People v. Windfield* (2021) 59 Cal.App.4th 496 is also not helpful. The sentencing in that case occurred no later than 2014— i.e., *before Franklin* was decided.

[14] The *Carranza* court later filed an unpublished opinion agreeing with *Medrano*.

## DISPOSITION

The judgment is affirmed without prejudice to Maddox's filing a motion in the trial court for a *Franklin* proceeding.


DATO, J.

WE CONCUR:


AARON, Acting P. J.


IRION, J.